On appellant's reconsideration dated October 28, reconsideration allowed; former opinion filed September 28, 1983 (64 Or App 855, 669 P2d 843) reversed and remanded January 25, respondent Pathology Consultants' reconsideration of opinion on reconsideration allowed; former opinion filed January 25 modified with instructions April 4 (67 Or App 527, 678 P2d 781), respondent Marzano's reconsideration denied April 6, respondent Marzano's petition for review allowed November 6, 1984 (298 Or 172)
See 298 Or 792, 696 P2d 1087 (1985)

## JEFFERIS,
*Appellant,*

*v.*

## MARZANO et al,
*Respondents.*

(16-79-93226; CA A21703)

676 P2d 880

J. Michael Alexander, and Burt, Swanson, Lathen, Alexander & McCann, Salem, for petition.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

**ROSSMAN, J.**

This is a wrongful death case involving allegations of medical malpractice in the diagnosis and treatment of uterine cancer. At the conclusion of the trial, the jury returned a verdict in favor of defendants. Plaintiff appealed, setting forth five assignments of error. Originally, we affirmed the trial court without opinion. 64 Or App 855, 669 P2d 843 (1983). Thereafter, plaintiff filed this petition for reconsideration. Because of our concern over the trial court's allowing certain hearsay testimony about the practices of other doctors in the community, we allow the petition to reconsider this single issue.

Plaintiff contends that prejudicial evidentiary error was committed when defendant Dr. Marzano was allowed to testify that his acts were up to a standard of care established by the fact that he had conferred with a number of named doctors and they had told him that his practices were acceptable. On reconsideration, we now agree with plaintiff. Accordingly, we reverse and remand.

## FACTUAL BACKGROUND

Plaintiff is the personal representative of the estate of Jo Ann Wood, who died as a result of defendants' alleged malpractice. Decedent first encountered Dr. Marzano in December, 1976, when she went to him for a gynecological examination and routine Pap smear. The examination was normal in all respects, except that there was an eversion of the cervix. She returned to him in 1977 for another examination and Pap smear. The Pap smear was forwarded to defendant Pathology Consultants. Along with the smear went a form with the patient's name, the patient's number and the name of Dr. Marzano.

After the results of the laboratory tests are recorded on the form, the top copy is sent back to the treating physician, the middle copy is used for billing and the bottom copy is retained in the lab's files. Mrs. Wood's 1977 slide was viewed by a technologist for Pathology Consultants, who noted some atypical cells and marked them with dots for the pathologist's attention. She also wrote "repair or worse," "microinvasive?" on the lab form. Dr. Meyers then examined the slide and noted what he felt were repair changes. Although

the cells were atypical, he marked a box on the form denoting "no atypical cells." He also wrote at the bottom of the form: "marked repair change, please repeat in three to six months to rule out coexistent dysplasia or carcinoma in-situ."

That lab report form was then returned to Dr. Marzano's office, where it was viewed by Sharon Henderson, a woman with some nurse's aide training but no education, experience or certification as a nurse. She had been instructed not to bring the report to the attention of the physician if the box for "no atypical cells" was checked. Apparently, Dr. Marzano did not read the notation placed on the form by the pathologist. Ms. Henderson attempted to phone Mrs. Wood a couple of times about a re-examination, but her efforts were futile. The file then disappeared from her desk, and no further communication was initiated.

Pathology Consultants, concerned because it had received no evidence of a follow-up examination, as suggested on the lab report, wrote Dr. Marzano in March, 1978, inquiring about the suggested follow-up and possible need for further examination. This letter, like the lab report, was received by Ms. Henderson. Unfortunately, she inadvertently pulled the chart of Jo Ann *Woods,* another patient who earlier had undergone a hysterectomy. Henderson assumed that the chart belonged to Mrs. Wood and accordingly reported to Pathology Consultants that a hysterectomy had been performed on her. That ended their concern about re-examination. Dr. Marzano was not given the letter from Pathology Consultants. In July, 1978, and again in October of that year, Mrs. Wood called Dr. Marzano's office, complaining of intramenstrual spotting and other cervical complaints. An examination by Dr. Marzano at the end of October revealed an enlarged cervix which bled when touched and, according to Dr. Marzano, looked like cancer. He took a Pap smear and sent it to Pathology Consultants, which initially found "squamous" cancer, Grade 3. Dr. Marzano then spoke to Mr. and Mrs. Wood and explained how his office and the lab had mishandled the 1977 smear and the subsequent follow-up.

Mrs. Wood was referred to Dr. Nakao, who clinically staged her at "1-B" but diagnosed the disease as adenocarcinoma. Surgery was performed at the end of January, 1979, and doctors found that the cancer had spread outside the

treatment area and to the bladder, bowel and surrounding area. The disease had also metastasized into the lymph nodes, was then in Stage 4 and was too widespread for radiation. Chemotherapy was the only available treatment, but the situation was essentially hopeless. Mrs. Wood then went into rapid decline and, after months of pain, died in May, 1979. The autopsy revealed adenosquamous cancer as the terminal agent.

## THE EVIDENTIARY ISSUE

As part of the case, plaintiff maintained that Ms. Henderson had neither the training nor the experience to handle the lab reports. The specific issue raised by plaintiff's assignment of error concerns the appropriateness of a series of questions asked Dr. Marzano on direct examination relating to the particular practice of having nonmedical office personnel review lab reports. What follows are portions of that colloquy:

"Q. [BY MR. CALKINS]: Dr. Marzano, with regard to Sherry Henderson and the functions she carried out with respect to Pap smear reports, do you have an opinion as to whether that is an appropriate function for her to carry out in this case?

"* * * * *

"A. Yes, I do. The question is why do we let her look at the Pap smears. That is the big question in this whole thing.

"MR. SCHROETER: I object to the response as not responsive. He is reframing the question inappropriately. He's not being responsive.

"THE COURT: Overruled.

"[BY MR. CALKINS]: Go ahead.

"A. When I came to Springfield to set up my practice, I had been practicing obstetrics and gynecology for about ten years either as a resident or in my service training, or as a student where I trained with the Cancer Referral Center for Wisconsin, and we were one of the two major cancer treating centers in the state of Wisconsin, one in Milwaukee and one in Madison, Wisconsin.

"My experience with cancer of the cervix and pap smears was under Dr. Adolph Stafl, who was one of the foremost doctors as far as cancer detection and the specific procedure you heard about on colposcopy where you look at the cervix

with a microscope. It was my experience and training that this is the way they handled pap smears and I found no problem with it. We had, I don't know, literally hundreds of patients referred per year there for screening of abnormal cervical problems.

"The way the pap smears were handled at our referral institution was that a non-MD, a non-doctor person would take the pap smears, would sort through them. The normal ones she would file in the chart. The abnormal ones she would pull and show to the doctor.

"I had the same experience in the service as far as I can remember, and then when we came to town it was important that we do things like other doctors in the Eugene-Springfield area were doing, and we found that at the time we came to town in 1975, many other people in many other clinics —

"MR. SCHROETER: I will object to what other doctors did. In the first place, everybody could be disobeying the law. I don't know whether they do or not. I never heard of a doctor who did what they did in my life. That isn't the issue, what he has heard from somebody.

"* * * * *

"THE COURT: Now, to the extent that we have a standard of the care exercised by other physicians in the community in Dr. Marzano's specialty, I would think that evidence of what other doctors do in the community is certainly relevant.

"* * * * *

"MR. SCHROETER: The threshold point is that it is hearsay. He is telling us that he has learned from other doctors who are not here to be cross-examined what their practice was in this community.

"* * * * *

"THE COURT: Your objection is that he is asking specifically what other doctors do rather than simply asking the general question?

"* * * * *

"MR. SCHROETER: First, it is hearsay. Secondly, it is irrelevant for both technical and factual reasons which I won't detail further. I think you are aware of the technical and legal reasons, the factual ones being the contention of what he does. I mean I could spell it out but I don't want to. I have made my objection clear, I think.

"THE COURT: Mr. Calkins?

"MR. CALKINS: Well, we simply offered the question to show his explanation of standard of care and what others in the community do. Other witnesses have been asked similar questions, and I think it is appropriate to ask this witness that.

"* * * * *

"[BY MR. CALKINS]: Dr. Marzano, you were stating that in about 1975, 1976, and 1977 when you first came into the community, you were aware that other doctors had a similar practice, and could you explain that, please?

"A.   Yes. I told you what my experience was in my training in the service, and then I was aware that in the community of Springfield-Eugene, that the majority of the OB-GYN's were handling pap smears the way I have been trained to handle them, that is with a non-doctor sorting and filing them.

"Those doctors that were doing that, so that we can be specific, were Dr. Robert Furrer, Dr. John Cockrell, Dr. Emmett Woodward, Dr. Rit Stenger, Dr. Donald Woomer, Dr. Gary LeClair, Dr. Robert Jacobson, and Dr. William Post. There were approximately 17 practicing obstetrician-gynecologists in Springfield at that time, and there were more than the majority that were handling them that way.

"Also Planned Parenthood, Family Planning, and the Student Health Center at the University of Oregon, all who have governing boards made of obstetrician-gynecologists, were also handling pap smears in this manner.

"So that was the basis that I used to feel that with my training and what was going on in the community, that this was a correct thing to do.

"MR. SCHROETER: I'm going to move to strike it because I do not believe for a minute that it is true nor do I believe —

"* * * * *

"THE COURT: What portion of it are you asking me to strike?

"MR. SCHROETER: I am asking you to strike his assertion on this stand that all the people he named did something in a way that we have already discussed.

"THE COURT: The specific names?

"MR. SCHROETER: The specific names, and the health service and the Planned Parenthood. These people aren't subject to be cross-examined, are they? Therefore, I move to strike.

"THE COURT: Why didn't you object when he began to delineate them?

"MR. SCHROETER: My point, Your Honor, is that you cannot by asserting that you have taken a poll define a standard of care. If I open it up in a certain way it is possible that he could then come up with this. In direct there is no way that I know of that I can cross-examine those assertions. That's why what a specific person does that is not subject to cross-examination has always been inappropriate testimony. I mean what am I supposed to do? I don't know whether he is telling the truth or not.

"THE COURT: Your motion is that I strike the names of the particular doctors? Is that your motion?

"MR. SCHROETER: Yes, and the specific institutions that he went into that I can't cross-examine.

"THE COURT: Mr. Calkins, do you have a response to that?

"MR. CALKINS: I think it is appropriate in the explanation of the answer, what he knows is the general practice in the community, and I don't have anything further to say.

"THE COURT: I will overrule the objection."

■ Therefore, the question is whether the trial court erred in failing to strike those portions of Dr. Marzano's testimony in which he gave the names of individual doctors in the community who, according to him, also used non-medical office staff to screen Pap smear lab reports. The answer is clearly yes.

■ It is beyond dispute that Dr. Marzano is competent to give testimony concerning the standard of care in the Eugene-Springfield medical community. However, the manner of presentation and the content of his testimony were improper and clearly prejudiced plaintiff. His direct testimony that he had been told by other doctors in the area that they process Pap smear data the same way he did is clearly hearsay, and it violates all of the policies which traditionally require the exclusion of that form of evidence. *See Sheedy v. Stall,* 255 Or 594, 468 P2d 529 (1970).

Dr. Marzano offered the out-of-court statements of several local doctors as to the prevalence of certain procedures in an effort to show that those procedures were widely used so that he could demonstrate that his use of those same procedures was up to the standard of care in the community. In effect, he was allowed to establish a standard of care, and thus to exonerate himself from responsibility for plaintiff's decedent's death, by testifying to what he said other named doctors and organizations in the community had told him. This practice has been condemned in Oregon, most notably in the case of *Baldassarre v. West Oregon Lbr. Co.,* 193 Or 556, 239 P2d 839 (1952), where the plaintiff had sued his employer for injuries suffered in an industrial accident, which was allegedly caused by the defendant's failure to install a safety device called a "toe guard." In an effort to establish its freedom from negligence, the defendant employer called a member of the employe safety committee. Over the plaintiff's objection, he was allowed to testify about the opinions of company employes who opposed installation of the "toe guard." In ruling that the evidence should have been excluded, the Supreme Court stated:

> "Whether the defendant fell short of compliance with [the standard of care] by failing to maintain a toe guard at the walkway is not to be determined by a Gallup poll of employees, nor by hearsay evidence of the reasons or arguments advanced by some of the employees in opposition to use of the device. * * *" 193 Or at 569.

The reasons given by the Supreme Court for ruling the testimony inadmissible in *Baldassarre* are equally compelling in this case:

> "* * * [T]he testimony now under consideration amounts to nothing more than evidence of the opinions and statements of persons who were not themselves witnesses, were not sworn, and not subject to cross-examination. * * *" 193 Or at 569.

Permitting defendant to testify as to what other doctors in the community told him about their procedures allowed him single-handedly to establish the standard against which his own conduct was to be measured. His use of hearsay for that purpose denied plaintiff the opportunity to cross-examine the individuals whose purported statements were critical in determining the outcome of the case. The lack of

that opportunity could easily have caused the jury to exaggerate the weight of defendant's testimony and lead to the impermissible inference that, because those other named doctors in the same community used the same procedures as defendant, they must necessarily also approve of what he did in this case. Accordingly, we reverse.

Petition for reconsideration allowed; reversed and remanded.