Argued and submitted January 29, reversed March 19, reconsideration denied
April 23, 1985

**JEFFERIS,**
*Respondent on review,*

*v.*

**MARZANO,**
*Petitioner on review,*

(CC 16-79-03226; CA A21703; SC S30460)

696 P2d 1087

Randall Bryson, of Bryson & Bryson, Eugene, argued the cause for petitioner on review. With him on the petition was Calkins & Calkins, Eugene.

J. Michael Alexander, of Brown, Burt, Swanson, Lathen & Alexander, Salem, argued the cause for respondent on review.

JONES, J.

## JONES, J.

This is an appeal of a medical malpractice civil case against a physician and a pathology consulting corporation. The defendants were charged with negligence in the diagnosis and treatment of uterine cancer which caused the death of a 27-year-old woman. A jury found in favor of both defendants and judgment was entered accordingly.

The Court of Appeals originally affirmed the trial court judgment without opinion but, on reconsideration, reversed and remanded the case, holding that the trial judge erred in an evidentiary ruling. *Jefferis v. Marzano,* 64 Or App 855, 669 P2d 843 (1983), *rev'd and remanded on reconsideration* 66 Or App 725, 676 P2d 880 (1984).[1] We granted review to consider the evidentiary issue and to discuss the trial procedure which occurred when that issue arose.

The factual history of the case was accurately set forth by Judge Rossman in the Court of Appeals opinion as follows:

"Plaintiff is the personal representative of the estate of Jo Ann Wood, who died as a result of defendants' alleged malpractice. Decedent first encountered Dr. Marzano in December, 1976, when she went to him for a gynecological examination and routine Pap smear. The examination was normal in all respects, except that there was an eversion of the cervix. She returned to him in 1977 for another examination and Pap smear. The Pap smear was forwarded to defendant Pathology Consultants. Along with the smear went a form with the patient's name, the patient's number and the name of Dr. Marzano.

"After the results of the laboratory tests are recorded on the form, the top copy is sent back to the treating physician, the middle copy is used for billing and the bottom copy is retained in the lab's files. Mrs. Wood's 1977 slide was viewed by a technologist for Pathology Consultants, who noted some atypical cells and marked them with dots for the pathologist's

---

[1] The opinion on reconsideration reversing and remanding to the trial court was filed January 25, 1984. On February 7, 1984, defendant Pathology Consultants filed a petition for reconsideration of the opinion on reconsideration. The Court of Appeals allowed the petition and affirmed the trial court judgment as to Pathology Consultants, modifying its former opinion to reflect that the reversal of the trial court judgment applied only to defendant Marzano. *Jefferis v. Marzano,* 67 Or App 527, 678 P2d 781 (1984). Plaintiff did not seek review of this ruling.

attention. She also wrote 'repair or worse,' 'microinvasive?' on the lab form. Dr. Meyers then examined the slide and noted what he felt were repair changes. Although the cells were atypical, he marked a box on the form denoting 'no atypical cells.' He also wrote at the bottom of the form: 'marked repair change, please repeat in three to six months to rule out coexistent dysplasia or carcinoma in-situ.'

"The lab report form was then returned to Dr. Marzano's office, where it was viewed by Sharon Henderson, a woman with some nurse's aide training but no education, experience or certification as a nurse. She had been instructed not to bring the report to the attention of the physician if the box for 'no atypical cells' was checked. Apparently, Dr. Marzano did not read the notation placed on the form by the pathologist. Ms. Henderson attempted to phone Mrs. Wood a couple of times about a re-examination, but her efforts were futile. The file then disappeared from her desk, and no further communication was initiated.

"Pathology Consultants, concerned because it had received no evidence of a follow-up examination, as suggested on the lab report, wrote Dr. Marzano in March, 1978, inquiring about the suggested follow-up and possible need for further examination. This letter, like the lab report, was received by Ms. Henderson. Unfortunately, she inadvertently pulled the chart of Jo Ann *Woods,* another patient who earlier had undergone a hysterectomy. Henderson assumed that the chart belonged to Mrs. Wood and accordingly reported to Pathology Consultants that a hysterectomy had been performed on her. That ended their concern about re-examination. Dr. Marzano was not given the letter from Pathology Consultants. In July, 1978, and again in October of that year, Mrs. Wood called Dr. Marzano's office, complaining of intramenstrual spotting and other cervical complaints. An examination by Dr. Marzano at the end of October revealed an enlarged cervix which bled when touched and, according to Dr. Marzano, looked like cancer. He took a Pap smear and sent it to Pathology Consultants, which initially found 'squamous' cancer, Grade 3. Dr. Marzano then spoke to Mr. and Mrs. Wood and explained how his office and the lab had mishandled the 1977 smear and the subsequent follow-up.

"Mrs. Wood was referred to Dr. Nakao, who clinically staged her at '1-B' but diagnosed the disease as adenocarcinoma. Surgery was performed at the end of January, 1979, and doctors found that the cancer had spread outside the treatment area and to the bladder, bowel and surrounding

area. The disease had also metastasized into the lymph nodes, was then in Stage 4 and was too widespread for radiation. Chemotherapy was the only available treatment, but the situation was essentially hopeless. Mrs. Wood then went into rapid decline and, after months of pain, died in May, 1979. The autopsy revealed adenosquamous cancer as the terminal agent." (Emphasis in original.)

As a key part of the case, the plaintiff maintained that Dr. Marzano was negligent in allowing a non-medical person to evaluate and handle lab reports. The specific issue raised by the plaintiff's claim of evidentiary error, and the one on which the Court of Appeals reversed the trial court, concerned the following series of questions and answers asked Dr. Marzano by defense counsel on direct examination relating to whether the practice of having a non-medical person review lab reports was proper:

"Q [BY DEFENSE COUNSEL] Now, Sherry Henderson [the non-medical employe of defendant], as part of her duties, reviewed Pap smears and reports with respect to negative and positive reports. In your experience, was that an appropriate function for her to carry out, in your opinion?"

To this question plaintiff's counsel made numerous objections and, at the suggestion of the court, defense counsel reframed the question as follows:

"Q [BY DEFENSE COUNSEL] Dr. Marzano, there has been testimony here with respect to Sherry Henderson's function with respect to the Pap smear reports which came to your office. Would you tell the jury in your opinion was that an appropriate function for her to carry out in your office?"

Again plaintiff's counsel made several objections which were overruled, but before the witness could answer defense counsel asked a third question as follows:

"Q [BY DEFENSE COUNSEL] Dr. Marzano, with respect to Sherry Henderson and the functions she carried out with respect to Pap smear reports, do you have an opinion as to whether that was an appropriate function for her to carry out in this case?"

To which plaintiff's counsel objected for the reasons stated to the previous versions of that same question. We recap the objections as follows:

(1) Objection to the form of the question;

(2) The question was improper because it contained a statement by counsel which may or may not be true;

(3) The answer to the question was beyond the witness's competence;

(4) The question was ambiguous;

(5) The question called for a legal conclusion;

(6) The question was leading;

(7) The question assumed facts that were not in evidence.

The trial court overruled all these objections. We believe the ruling was correct, because the question as finally presented to the witness essentially called upon the physician to render an opinion as to whether his employe was engaged in an appropriate function[2] in handling Pap smear reports.

The defendant doctor answered the question as follows:

"Yes, I do. The question is why do we let her look at the Pap smears. That is the big question in this whole thing.

After an objection was overruled that the witness was not being responsive, Dr. Marzano continued:

"When I came to Springfield to set up my practice, I had been practicing obstetrics and gynecology for about ten years either as a resident or in my service training, or as a student where I trained with the Cancer Referral Center for Wisconsin, and we were one of the two major cancer treating centers in the state of Wisconsin, one in Milwaukee and one in Madison, Wisconsin.

"My experience with cancer of the cervix and Pap smears was under Dr. Adolph Stafl, who was one of the foremost doctors as far as cancer detection and the specific procedure you heard about on colposcopy where you look at the cervix with a microscope. It was my experience and training that this is the way they handled Pap smears and I found no problem

---

[2] As we said in *Creasey v. Hogan,* 292 Or 154, 166-67, 637 P2d 114 (1981):

"* * * The competency of the expert to express an opinion is not established by knowledge of the legal standard of care but by knowledge of what is proper conduct by practitioners in the community or a similar community under circumstances similar to those which confronted the defendant. * * *"

with it. We had, I don't know, literally hundreds of patients referred per year there for screening of abnormal cervical problems.

"The way the Pap smears were handled at our referral institution was that a non MD, a non doctor person would take the Pap smears, would sort through them. The normal ones she would file in the chart. The abnormal ones she would pull and show to the doctor.

"I had the same experience in the service as far as I can remember, and then when we came to town it was important that we do things like other doctors in the Eugene-Springfield area were doing, and we found that at the time we came to town in 1975, many other people in many other clinics —"

Plaintiff's counsel then, in the presence of the jury, interjected the following objection to the doctor's testimony as follows:

"I will object to what other doctors did. In the first place, everybody could be disobeying the law. I don't know whether they do or not. *I never heard of a doctor who did what they did in my life.* That isn't the issue, what he has heard from somebody.

"The question is why is it appropriate to have a totally unlicensed person making a diagnosis. That is the issue he is trying to answer, and anything else referring to what other doctors do is improper.

"* * * * *

"It is hearsay as well." (Emphasis added.)

The court then observed that "one of the issues is what is the community standard among specialists in this community," to which plaintiff's counsel responded:

"The threshold point is that it is hearsay. He is telling us that he has learned from other doctors who are not here to be cross-examined what their practice was in this community."

The court further observed:

"There might be ways of arriving at a community standard other than calling each member of that community in one by one."

We break into the testimony and colloquy between court and counsel at this point to analyze what has occurred.

The testimony of the witness adds up to the doctor stating that he allowed a non-medical person to sort out normal and abnormal Pap smear reports because this was:

(1) the practice used in his training as a resident specializing in obstetrics and gynecology;

(2) the practice in his service training;

(3) the practice at the Cancer Referral Center for Wisconsin;

(4) the practice of Dr. Adolph Stafl, one of the foremost experts in the field; and

(5) his own practice in handling hundreds of patients over a 10-year period.

We break down the legal objections of plaintiff's counsel to the answer as follows:

(1) everybody could be disobeying the law;

(2) the lawyer himself had never heard of a doctor who followed that practice;

(3) testimony referring to what other doctors do is improper; and

(4) the witness was relying on hearsay.

■ In discussing the basis for expert opinion, distinctions must be drawn between: (1) information and understanding that the witness has acquired as a result of his education and experience that constitute him an expert in his field; (2) information concerning the facts of the litigated case; and (3) information concerning the appropriate procedure involved in the litigated case. In this case we are concerned with the third category. Included in this third category are the expert's own experience in comparable cases, the experience of other experts communicated to him and professional principles, practices and theories that he has learned from technical literature, shop talk and the like.

■ It is clear that there can be no valid objection to the fact that a witness's opinion rests upon hearsay in the sense that the information he relies upon to know the appropriate medical practice is derived in part from extrajudicial statements of others. Such statements may include lectures in

medical school, writings of various kinds and conversations with colleagues. It is by assimilation of hearsay of this sort that expert opinions are in fact, for the most part, made, and to demand education independent of the statement of others is to demand what does not exist and will not be forthcoming. *See* Weinstein, Mansfield, Abrams and Berger, Cases and Materials on Evidence 399 (7th ed 1983).

■ None of these objections was well taken. The appropriate medical practice is most commonly proven by learning what other specialists in the field do in the area. The appropriate medical practice in this case could have been observed by the physician at a hospital or in any other clinical setting; learned at a staff meeting at a hospital or at an educational seminar; ascertained from reading medical literature; and, finally, the appropriate medical practice could be ascertained by discussing the proper method for sorting out Pap smear reports with other doctors in the community as to what they do.

All this information is what a specialist actually uses to decide what medical practice to utilize in his or her chosen specialty. All this information is usually and properly relied upon by specialists when making their day-to-day life and death decisions in the practice of medicine. It is only incidental that this same information may be used by a physician in rendering an expert opinion in court.[3] Although OEC 703[4] was enacted by the legislature after this case arose, the legislative commentary to this rule of evidence succinctly states the reason for allowing this type of trial testimony. The commentary reads:

"* * * A physician bases a diagnosis on information gathered from a number of sources, including statements by patients and relatives, opinion from nurses, technicians and

---

[3] On hearsay and expert testimony in general, *see* Maguire and Hahesy, *Requisite Proof of Basis for Expert Opinion,* 5 Vand L Rev 432 (1952), Selected Writings on Evidence and Trial 503 (1957); Rheingold, *The Basis of Medical Testimony,* 15 Vand L Rev 473 (1962).

[4] OEC 703 provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

other doctors, reports, hospital records and X-rays. Most of these are admissible into evidence, but only by the expenditure of substantial time in producing and examining authenticating witnesses. The physician makes life and death decisions in reliance upon these sources. That validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes. As McCormick notes, 'If the statements are attested by the expert as the basis for a judgment upon which [the physician] would act in the practice of [the] profession, it seems that they should ordinarily be a sufficient basis even standing alone for [the physician's] direct expression of professional opinion on the stand....' McCormick, *Evidence* section 15 at 36 (2d ed 1972). * * *"

■ Although we are concerned in this case with the issue of what is the defendant doctor's opinion about appropriate medical practice as opposed to a diagnosis, both are a matter of professional opinion and the background information needed for the physician's opinion is the same. To be sure, the defendant could have subpoenaed every obstetrician/gynecologist practicing in the Springfield-Eugene area or others elsewhere and asked each specialist how Pap smear reports are handled in the specialist's office, and the sum total of that testimony would clearly demonstrate the appropriate practice. In addition, each of the specialists could be asked if they knew the appropriate practice for handling such reports. Testimony of this nature not only would be time-consuming, but of more importance, would be unnecessary. Each of these specialists in testifying about the appropriate medical practice would necessarily have to resort to the same sources of information as relied upon by the witness in this case. In effect each would testify, "I do it this way because I learned to do it this way. I learned to do it this way by talking to other doctors, attending staff meetings, observing other specialists' practices, reading literature, etc." The same objection could be raised and the solution no different.

■ Oregon has recognized that experts in land condemnation cases may rely upon the out-of-court discussions by others involved in sales of real property as a proper basis for forming their opinions on the value of property. *See, Highway Commission v. Fisch-Or,* 241 Or 412, 399 P2d 1011, 406 P2d 539 (1965). Similarly, prior to the adoption of OEC 703, we have held that expert medical witnesses may base their opinions at trial upon medical charts and records not in

evidence to the same extent that they would rely upon the same documents in the treatment of their patients. *Lewis v. Baker*, 243 Or 317, 326, 413 P2d 400 (1966). The facts or data which form the basis for the opinion need not be restricted to hospital charts or records, but may include any facts or data of "a type reasonably relied upon by experts in the field" in making their day-to-day professional opinions or in engaging in their day-to-day standard of practice. The objection by counsel that the doctor's answer was based on hearsay was properly overruled by the trial court.[5]

After the court overruled the hearsay objection, defense counsel asked the defendant physician the following question:

"Dr. Marzano, you were stating that in about 1975, 1976, and 1977 when you first came into the community, you were aware that other doctors had a similar practice, and could you explain that, please?

To which the witness responded:

"Yes. I told you what my experience was in my training in the service, and then I was aware that in the community of Springfield-Eugene, that the majority of the OB-GYN's were handling Pap smears the way I have been trained to handle them, that is with a non doctor sorting and filing them.

"Those doctors that were doing that, so that we can be specific, were Dr. Robert Furrer, Dr. John Cockrell, Dr. Emmett Woodward, Dr. Rit Stenger, Dr. Donald Woomer, Dr.

---

[5] We note that the objection was not restricted to hearsay but included an unsworn statement by counsel: "I don't know whether [everybody could be disobeying the law]. I never heard of a doctor who did what they did *in my life*." (Emphasis added.) Defense counsel objected that the plaintiff's lawyer's statement was inappropriate to be made before the jury. We certainly agree. No counsel should express personal opinions on the facts of a case or give unsworn testimony about an essential aspect of a case at any time and especially before the jury. DR 7-106(C)(3) provides:

"In appearing in the lawyer's professional capacity before a tribunal, a lawyer shall not:

"* * * * *

"(3) Assert his personal knowledge of the facts in issue, except when testifying as a witness."

Trial courts must restrict counsel's objections to a statement of the antiseptic legal grounds without argument and without comment. After hearing counsel's objection, ordinarily the court should rule on the objection and if either party is aggrieved by the ruling the aggrieved party should ask to be heard on the objection outside the presence of the jury. There should be no occasion for discussion of legal matters before the jury.

Gary LeClair, Dr. Robert Jacobson, and Dr. William Post. There were approximately 17 practicing obstetrician-gynecologists in Springfield at that time, and there were more than the majority that were handling them that way.

"Also Planned Parenthood, Family Planning, and the Student Health Center at the University of Oregon, all who have governing boards made up of obstetrician-gynecologists, were also handling Pap smears in this manner.

"So that was the basis that I used to feel that with my training and what was going on in the community, that this was a correct thing to do."

Again, plaintiff's counsel launched into a totally inappropriate objection moving to strike the answer because, "I do not believe for a minute that it is true." The court instantly and appropriately cut off counsel's outburst by ruling that counsel's personal belief was irrelevant. However, the court's ruling did not dissuade plaintiff's counsel from continuing to inject his own alleged personal knowledge into the case. Plaintiff's counsel objected by stating:

"[PLAINTIFF'S COUNSEL]: But I cannot call into this Courtroom seven physicians, a health service, and the Planned Parenthood. *I know what they do myself. I can testify just as easily that within my experience nobody has ever done it.* It is hearsay and outside the scope of — It is a kind of comment that cannot be subject, no matter what you do, to cross-examination of these people.

"THE COURT: What portion of it are you asking me to strike?

"[PLAINTIFF'S COUNSEL]: I am asking you to strike his assertion on this stand that all the people he named did something in a way that we have already discussed.

"THE COURT: The specific names

"[PLAINTIFF'S COUNSEL]: The specific names, and the health service and the Planned Parenthood. These people aren't subject to be cross-examined, are they? Therefore, I move to strike.

"THE COURT: Why didn't you object when he began to delineate them?

"[PLAINTIFF'S COUNSEL]: My point, your Honor, is that you cannot by asserting that you have taken a poll define a standard of care. If I open it up in a certain way it is possible that he could then come up with this. In direct there is no way

that I know of that I can cross-examine those assertions. That's why what a specific person does is not subject to cross-examination has always been inappropriate testimony. I mean what am I supposed to do? I don't know whether he is telling the truth or not.

"THE COURT: Your motion is that I strike the names of the particular doctors? Is that your motion?

"[PLAINTIFF'S COUNSEL]: Yes, and the specific institutions that he went into that I can't cross-examine.

"* * * * *

"THE COURT: I will overrule the objection." (Emphasis added.)

We observe from the record that although plaintiff's counsel originally moved to strike the doctor's assertion on the stand that all the people he named "did something in a way that we have already discussed," upon inquiry from the court, counsel redefined his motion to strike the names of the particular doctors and the names of the specific institutions on the basis that he could not cross-examine them.

 The fact of the matter is that counsel could cross-examine the witness as to the *names* of each of the doctors and about the *names* of the institutions. Further, by being provided specific information, plaintiff's counsel could have called any or all the physicians named as well as persons practicing at the institutions if he wished to contradict Dr. Marzano's testimony. Even giving counsel's objection the widest scope, the witness merely was pointing out to the jury the basis of his opinion. His testimony was that he became aware of the practice by ascertaining which doctors were engaged in that practice and how those doctors performed the particular function of sorting Pap smear reports. There is not one word of testimony that any specific doctor made a specific out-of-court statement, oral, written or otherwise, which statement was offered in court to prove the truth of the matter asserted.[6] The testimony was that the witness "became *aware* of the standard of practice" (emphasis added), without defining how this awareness was developed. But even if the witness

---

[6] OEC 801(3) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OEC 801 adopts the essence of pre-code definitions of hearsay. *See, Sheedy v. Stall,* 255 Or 594, 468 P2d 529 (1970).

had personally talked to each of these doctors and each of these doctors had told the witness what his practice was in handling Pap smear reports, as we said earlier in this opinion, the testimony nevertheless would still not be subject to a hearsay attack because this information was gathered to form the basis of engaging in a standard of practice and is the type of data that physicians rely upon in making their day-to-day life and death decisions. This type of data which is commonly relied upon by physicians in making professional opinions and judgments is likewise a proper basis for forming expert opinions to be rendered in court.

The trial court's ruling as to each and every one of the defendant's objections was proper.

In disposing of this case, we do not turn our backs on the challenges inherent within OEC 703. This rule has been the subject of much controversy and may well present this court with future difficulty. *See* Arnolds, *Federal Rule of Evidence 703: The Back Door is Wide Open,* 20 Forum 1 (1984). However, our decision in this case would be the same whether we were dealing with OEC 703 or its predecessor law.

The Court of Appeals is reversed and the trial court judgment in favor of defendant Marzano is reinstated.