KA MEE LAI, aka ROSE LAI, and NARONGSAK LOESVARANURAK, aka STEVE LAI, Plaintiffs–Appellants, v. JEANNINE ST. PETER and JOHN KOTT, Defendants–Appellees, and JOHN DOE 1–10, DOE CORPORATION 1–10, DOE PARTNERSHIP 1–10, Defendants

NO. 15136

(CIV. NO. 88–4001–12)

MARCH 21, 1994

BURNS, C.J., HEEN, AND WATANABE, JJ.

## OPINION OF THE COURT BY WATANABE, J.

In this negligence case arising from an automobile accident, Plaintiffs–Appellants Ka Mee Lai, aka Rose Lai (Rose), and Narongsak Loesvaranurak, aka Steve Lai (Steve), (collectively, Plaintiffs) appeal from: (1) a December 5, 1989 order granting Defendant–Appellee John Kott's (Kott) motion for summary judgment, which dismissed all claims against Kott; (2) a November 2, 1990 judgment entered pursuant to a jury's verdict in favor of Defendant–Appellee Jeannine St. Peter (St. Peter); (3) a January 28, 1991 order denying Plaintiffs' motion for a new trial; and (4) a January 28, 1991 order granting in part and denying in part St. Peter's motion for costs.

We affirm.

### FACTS AND PROCEDURAL HISTORY

On the evening of November 26, 1986, Rose was a front–seat passenger in a car which her husband, Steve, was driving east–bound on Wai'alae Avenue, near the Kahala Mall Shopping Center. Wai'alae Avenue leads to an on–ramp to Kalaniana'ole Highway. Rose testified that Steve drove to the end of the on–ramp, then stopped the car for several seconds to wait for traffic to clear, so that he could merge onto Kalaniana'ole Highway.[1] While stopped, Steve's car was struck from the rear by the vehicle driven by St. Peter. St. Peter, who was visiting Hawai'i with her husband, was driving a car owned by her cousin, Kott, a Honolulu resident. Kott, who was away on the

---

[1] There is also some evidence that the car directly in front of Steve's car stopped abruptly, prompting Steve to immediately brake in an effort to avoid an impact with the front car. The car driven by St. Peter then hit Steve's car from the rear.

mainland, had given St. Peter permission to stay at his home and use his car while she was visiting Hawai'i.

After the accident, which caused minimal damage to both automobiles, Rose walked to a nearby gas station and called the police. She did not complain of any injuries at the time, and declined medical attention.

However, in January 1987, Rose began experiencing back pain and, as a result, saw Dr. Clifford Lau (Dr. Lau) on February 25, 1987 for treatment.[2] Dr. Lau diagnosed Rose as having a tight hamstring and prescribed an anti–inflammatory drug.

In May 1987, Rose began treatment for back pain with Dr. Kurt Mariano (Dr. Mariano), a chiropractor.[3] On June 16, 1987, Dr. Mariano referred Rose to Dr. Kenneth Nakano. (Dr. Nakano), a neurologist. Dr. Nakano performed various physical and neurological tests on Rose, but found no abnormalities. Dr. Nakano recommended physical therapy and referred Rose back to Dr. Mariano to make the necessary arrangements. Rose did not, however, receive physical therapy, although she continued to see Dr. Mariano until the end of July 1987, when she left for Hong Kong.

Rose returned from Hong Kong in December 1987, and on February 5, 1988, at the recommendation of her attorney, she saw Dr. K. C. Yeung (Dr. Yeung) at the Family Practice and Personal Injury Center. In March 1988, Dr. Yeung referred Rose to Dr. Cleveland Wu (Dr. Wu), who conducted an electromyograph test (EMG), which revealed an abnormality or irritation of Rose's lumbar five (L5) nerve root. Dr. Yeung continued to treat

---

[2] Dr. Clifford Lau did not testify at trial.

[3] Dr. Kurt Mariano did not testify at trial.

Rose until June 1988, when Rose became pregnant with her second child. While pregnant, Rose was involved in a second automobile accident on November 28, 1988. After Rose had given birth, Dr. Yeung resumed treating her on March 3, 1989.

On December 30, 1988, Plaintiffs filed a complaint against Defendants St. Peter and Kott, alleging that St. Peter acted negligently in operating the automobile involved in the accident and that Kott negligently entrusted the automobile to St. Peter. Plaintiffs sought special, general, and punitive damages for Rose's physical, mental, and emotional injuries, and for Steve's loss of consortium and mental and emotional anxiety.

The negligent entrustment claim against Kott was subsequently dismissed by stipulation of the parties; however, Plaintiffs amended their complaint to allege that St. Peter had acted as an agent, servant, or employee of Kott, who was therefore liable to Plaintiffs under the doctrine of *respondeat superior*. On December 5, 1989, the trial court granted Kott's motion for summary judgment and dismissed with prejudice all claims against Kott.

Prior to the commencement of a jury trial on September 24, 1990, the parties stipulated that St. Peter was responsible for the November 26, 1986 accident. The sole issue at trial, therefore, was whether the accident was the legal cause of Rose's injuries. When the jury answered this question in the negative, the circuit court entered judgment in favor of St. Peter. The circuit court subsequently denied Plaintiffs' motion for a new trial and granted, in part, St. Peter's motion for costs. This appeal followed.

According to Plaintiffs, the trial court committed several reversible errors. First, Plaintiffs contend that the

trial court erred in granting Kott's motion for summary judgment. Second, Plaintiffs allege that certain testimony by an expert witness should not have been allowed at trial. Finally, Plaintiffs maintain that the trial court abused its discretion in denying their motion for a new trial.[4]

## DISCUSSION

### I.

### *Order Granting Kott's Motion for Summary Judgment*

Pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c), a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

According to Plaintiffs, the trial court improperly granted Kott's Motion for Summary Judgment because genuine issues of material fact existed as to whether St. Peter was employed by Kott and whether Kott was liable to Plaintiffs under the doctrine of *respondeat superior.* We disagree.

An "employee" is commonly and ordinarily defined as "one who works for a salary or wages under directions." *In re Peck*, 19 Haw. 181, 182 (1908). At common law,

---

[4] Although Plaintiffs appealed from the January 28, 1991 Order Granting in Part and Denying in Part Defendant St. Peter's Motion for Costs, they failed to raise any arguments with respect to this issue in their brief. Accordingly, we deem these errors to be waived and abandoned on appeal. *Berkness v. Hawaiian Elec. Co.*, 51 Haw. 437, 438, 462 P.2d 196, 197 (1969).

four elements were considered in determining whether an employment, or master–servant, relationship existed: (1) the selection and engagement of the servant; (2) the payment of wages; (3) the power of dismissal; and (4) the power of control of the servant's conduct. 53 AM. JUR. 2D *Master and Servant* § 2, at 82 (1970).

In this case, the overwhelming evidence in the record indicates that St. Peter was not Kott's employee. Kott testified that St. Peter did not receive any monetary compensation for staying at his home while she was in Hawai'i. Deposition of Kott at 11, attached to Kott's Memorandum in Opposition to Plaintiffs' Motion to Amend Complaint. Record on Appeal (R.A.), volume 1 at 170. Moreover, St. Peter purchased her own plane ticket to Hawai'i and paid for her own food, gas, and other expenses while she was staying at Kott's home. *Id.* St. Peter testified that she was visiting Hawai'i on personal vacation at the time of the automobile accident and at no time considered herself an employee of Kott. Furthermore, Kott never directed or controlled the activities that St. Peter and her husband engaged in during their three weeks in Honolulu. Deposition of St. Peter at 116–17, R.A., volume 2 at 17–18.

Plaintiffs contend that Kott exerted control over St. Peter by leaving her a "list of duties she was required to perform" while he was away, thereby establishing an employment relationship. Opening Brief (O.B.) at 32. The record, however, reveals otherwise.

The list contained, among other things, general information regarding the daily operation of Kott's home, such as yard service, bug extermination service, sprinkler system, home appliances, swimming pool care, trash pickup, location of keys, and watering the plants. It also included

other information that might be helpful to St. Peter and her husband, such as names and phone numbers of the Kotts' neighbors, relatives, doctors, attorney, pastor, travel agent, auto mechanic, and insurance agent. Furthermore, the list requested that St. Peter and her husband not wear shoes in the house, sit on the furniture with wet or damp clothes or sweaty bodies, or leave valuables in the car when visiting the beach or other tourist stops. R.A., volume 2 at 36–38. St. Peter testified that the list was something that Kott had used for many years, even before her visit, for friends and family members who stayed in Kott's house while he was away. R.A., volume 2 at 24–25. St. Peter further testified that Kott never threatened to penalize her or her husband for failing to follow the list.

It has been recognized that "[i]f rules are made only for the general control of conduct of a person while on the premises of another, mere conformity to such rules does not indicate or establish that the persons involved are employees of the person making the rules." *Manchester Avenue Co. v. Stewart*, 50 Cal. 2d 307, 313–14, 325 P.2d 457, 461 (1958) (citing *Restatement of Agency* § 220, at 489, comment h (1933)).

In the instant case, the evidence, viewed in the light most favorable to Plaintiffs, does not support the conclusion that an employment relationship existed between Kott and St. Peter. The list in question merely established rules of conduct for guests on Kott's premises.

Furthermore, under the doctrine of *respondeat superior*, an employer is liable for an employee's negligent act only if the employee was acting within the scope of employment. *Henderson v. Professional Coatings Corp.*, 72 Haw. 387, 819 P.2d 84 (1991). Even if an

employment relationship did exist between Kott and St. Peter, it is undisputed that St. Peter was returning home from a personal Christmas shopping trip to Kahala Mall when the accident occurred, and was not then acting at Kott's direction or for Kott's benefit. Therefore, St. Peter was not acting "in the scope of employment."

Since there are no genuine issues as to any material fact that, if proved, would establish Kott's liability under the doctrine of *respondeat superior*, the trial court properly granted Kott's motion for summary judgment.

## II.

### *Admissibility of Dr. John Henrickson's Expert Testimony*

At trial, Dr. John Henrickson (Dr. Henrickson), after being qualified as an expert in neurosurgery, as well as the care, treatment, studies, and causes of back injuries, testified about an independent medical examination (I.M.E.) he had performed on Rose. Dr. Henrickson expressed his opinion that the tissue injuries which Rose suffered were the result of prolonged sitting, and not the November 26, 1986 automobile accident. Dr. Henrickson explained that the type of tissue injuries which Rose suffered usually do not result from automobile collisions involving low-speed impacts, and it was his understanding that St. Peter's vehicle was traveling at less than five miles per hour when the collision occurred. Dr. Henrickson further testified that his opinion that tissue injuries do not usually result from collisions occurring at less than five miles per hour was based on engineering studies he had learned about at an American Back Society seminar, as well as his own findings and experiences.

On cross–examination, Dr. Henrickson admitted that he learned from St. Peter's attorney that St. Peter's vehicle was traveling at less than five miles per hour when the collision occurred. Following Dr. Henrickson's testimony, St. Peter testified that she was traveling at two or three miles per hour when she collided with Plaintiffs' vehicle. Transcript (Tr.) 9/27/90 at 175.

Plaintiffs argue that Dr. Henrickson's testimony about low–speed collisions should never have been allowed because: (1) it was based on a fact, the speed of St. Peter's vehicle, which was not in evidence and which was supplied by an unreliable and untrustworthy source, St. Peter's attorney; and (2) it was based on studies which lacked proper foundation, constituted inadmissible hearsay, and were prejudicial.

The admission of expert testimony, however, is a matter resting within the discretion of the trial court, and only an abuse of that discretion can result in reversal. *Title Guaranty Escrow Services, Inc. v. Powley*, 2 Haw. App. 265, 270, 630 P.2d 642, 645 (1981). Our review of the record in this case reveals no such abuse of discretion.

## A.

Under Hawai'i Rules of Evidence (HRE) Rule 703, the authorized bases for an expert's opinion testimony are very broad. HRE Rule 703 provides:

> **Bases of opinion testimony by experts.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts

or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

HRE Rule 703 is substantially similar to Federal Rules of Evidence (FRE) Rule 703.[5] According to the Advisory Committee Notes on FRE Rule 703, there are three sources of information upon which the opinion of an expert witness may be based: (1) firsthand observation by the expert; (2) presentation of data to the expert at trial through a hypothetical question or by having the expert attend the trial and hear testimony of others; and (3) presentation of data to the expert outside of court and other than by his or her own perception. *See also* A. BOWMAN, HAWAI'I RULES OF EVIDENCE MANUAL § 703–2, at 292 (1990), M. GRAHAM, FEDERAL PRACTICE & PROCEDURE: *Evidence* § 6651, at 275–76 (Interim ed. 1992).

Professors Weinstein and Berger have observed that:

> The first sentence of Rule 703 codifies pre–Rules practice in permitting experts to testify from personal experience or from facts obtained at trial. . . .
>
> [T]he second sentence of Rule 703 constitutes a change from pre–Rules practice. Expert testimony based on inadmissible evidence, including hearsay, is now the rule rather than the exception.

3 WEINSTEIN & BERGER, WEINSTEIN'S EVIDENCE, ¶ 703[03], at 703–16 – 703–18 (1993) (footnotes omitted).

---

[5] The first two sentences of HRE Rule 703 are identical with FRE Rule 703. The last sentence of HRE Rule 703 was added to clarify the court's discretion to exclude untrustworthy opinions. HRE Rule 703 Commentary.

With the foregoing background in mind, we turn to an analysis of the bases of Dr. Henrickson's opinion testimony.

## B.

Plaintiffs contend that because there was no evidence in the record as to the speed of St. Peter's vehicle at the time Dr. Henrickson testified, Dr. Henrickson should not have been allowed to express an opinion based on such an assumption.

Dr. Henrickson's opinion about the nature of Rose's injuries, however, was clearly based on hypothetical data presented to him that the car which caused Rose's injuries was traveling at less than five miles per hour. Furthermore, evidence of the speed of St. Peter's vehicle was subsequently admitted through the testimony of St. Peter.

It has been recognized that an expert may rely upon "[f]acts, data, and opinions not yet received in evidence . . . subject to later introduction." M. GRAHAM, FEDERAL PRACTICE & PROCEDURE: *Evidence* § 6651, at 275 n.2 (Interim ed. 1992). For example, in *Barretto v. Akau*, 51 Haw. 383, 388, 463 P.2d 917, 920–21 (1969), a pre–HRE case, the Hawai'i Supreme Court decided that "in the cross–examination of an expert witness there is no requirement that hypothetical questions be based upon facts already in evidence."

Moreover, in the instant case, the trial judge expressly cautioned the jury that during the course of the trial, witnesses might be taken out of order to accommodate the scheduling constraints of the doctors who would be testifying.

Under the circumstances, the trial court's admission of Dr. Henrickson's testimony regarding his understand-

ing of the speed of St. Peter's car at the time of the accident was not an abuse of discretion.

## C.

At trial, Dr. Henrickson testified as follows:

Q. So let me turn then to your opinion, Doctor, to a reasonable degree of medical certainty as to what is the cause of the dysfunction that Ms. Lai is complaining of?

A. When I saw her it was because of a sacro-iliac joint dysfunction. That joint in the area of the buttocks. It's related to prolonged sitting. It's not related to any discrete trauma that happened when this automobile accident occurred.

Another thing I should mention, I didn't mention this before, at our last American Back Society meeting which was in December last year we had some scientific lecture [sic] pointed out that low velocity under five miles an hour, does not cause tissue damage.

[PLAINTIFFS' COUNSEL]: Objection, Your Honor. No foundation as to qualify as to the velocity of collisions, Your Honor.

THE COURT: I'm sorry. Approach the bench on the record.

(Bench conference out of the hearing of the jury:)

THE COURT: On the record I don't understand your objection.

[PLAINTIFFS' COUNSEL]: He's not testifying as on how velocity versus low velocity in the force impact. This is an area of physics, Your Honor. He's a doctor of neurosurgery. He's not a

doctor of forces of impact, Your Honor, and there's no — there has been no foundation he's had studies in it. There's no foundation that he's made any studies that there has been no foundation; he wasn't qualified for that purpose.

THE COURT: Overruled. The rules of evidence allow inquiry into the basis of the conclusion which he has rendered in this case or opinion. In this case the evidence has, I am sure, was given to him as a history within the case important of a low velocity impact. Therefore, inquiry into the area has been appropriate.

Further he based history significance or his pain somewhat on the study that it was represented to him at the last meeting. It is something that he can present to the jury. You can cross–examine if you want.

Tr. 9/27/90 at 83–84.

Plaintiffs complain that the foregoing testimony was beyond Dr. Henrickson's expertise, lacked a proper foundation, and constituted inadmissible hearsay. Furthermore, Plaintiffs allege that the prejudicial effect of the testimony outweighed its probative value.

### 1. *Dr. Henrickson's Expertise*

"The question of whether a witness qualifies as an expert is a matter addressed to the sound discretion of the trial court, and such determination will not be overturned unless there is a clear abuse of discretion." *Larsen v. State Sav. & Loan Ass'n*, 64 Haw. 302, 304, 640 P.2d 286, 288 (1982). Moreover:

It is not necessary that the expert witness have the highest possible qualifications to testify about a particular matter, but the expert witness must have such skill, knowledge, or experience in the field in question as to make it appear that his opinion or inference–drawing would probably aid the trier of fact in arriving at the truth. Once the basic requisite qualifications are established, the extent of an expert's knowledge of the subject matter goes to the weight rather than the admissibility of the testimony.

*Id.* (citations omitted).

In this case, the trial judge found Dr. Henrickson qualified as an expert in the area of neurosurgery, with expertise in the diagnosis, treatment, and causes of back injuries. He did so after an extensive *voir dire*, in which Dr. Henrickson testified that he: (1) was a board–certified neurosurgeon, licensed to practice in both California and Hawai'i since 1978; (2) had taught general neurosurgery through the residency program at Queen's Medical Center; (3) was a member of the American Board of Neurosurgery, the Honolulu Neurological Society, and the American Back Society; (4) had conducted studies involving individuals with injured backs; and (5) over the course of his practice, had diagnosed and treated more than a thousand patients with back problems.

In light of this evidence, the trial court did not abuse its discretion in qualifying Dr. Henrickson as an expert witness. Although Dr. Henrickson did not conduct nor have personal experience with the low–velocity impact and repetitive trauma studies about which he testified, his lack of experience and knowledge of the subject matter

goes to the weight, rather than the admissibility of his testimony.

## 2. Bases for Dr. Henrickson's Testimony

Plaintiffs contend that the trial court should not have allowed Dr. Henrickson to express his opinion as to the cause of Rose's injuries because his opinion was based partly on a study which lacked proper foundation and constituted hearsay. Plaintiffs point out that the author of the study was never identified, the study was never marked for identification or entered into evidence, and there was no showing that the test conditions upon which the study was based were substantially similar to the rear–end collision in the instant case. Moreover, Plaintiffs argue that there was no evidence presented that the theories espoused by the study were accepted by the medical community.

As noted above, however, HRE Rule 703 has liberalized the bases for expert testimony, and an expert is allowed to express an opinion based on facts and data which are not admissible into evidence if the facts and data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[.]" HRE Rule 703.

In determining whether an expert's reliance on information is reasonable, a trial court must evaluate the opinion and its foundation on a case–by–case basis. 3 WEINSTEIN & BERGER, WEINSTEIN'S EVIDENCE ¶ 703[03] at 703–24. Professors Weinstein and Berger have pointed out, however, that "[b]ecause of the Federal Rules emphasis on liberalizing expert testimony, doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions. The

jury is intelligent enough, aided by counsel, to ignore what is unhelpful in its deliberations." *Id.* ¶ 702[02] at 702–30 (footnotes omitted).

This guiding principle is especially true in Hawai'i, since pursuant to HRE Rule 702.1,[6] which has no counterpart in the FRE, broad cross–examination of an expert is permitted, in recognition of the liberal bases allowed for an expert's testimony. Indeed, the Commentary to Rule 702.1 notes:

> An expert witness differs from a lay witness principally in his ability to draw and to testify to inferences that are beyond the competence of the trier of fact. In addition, the expert is not restricted to firsthand knowledge and may base his opinions and inferences on a wide variety of data and facts perceived by him or made known to him, whether or not they are admissible in evidence, see Rule 703 infra.

---

[6] HRE Rule 702.1 (1985) provides:

**Cross–examination of experts.** (a) General. A witness testifying as an expert may be cross–examined to the same extent as any other witness and, in addition, may be cross–examined as to (1) the witness' qualifications, (2) the subject to which the witness' expert testimony relates, and (3) the matter upon which the witness' opinion is based and the reasons for the witness' opinion.

(b) Texts and treatises. If a witness testifying as an expert testifies in the form of an opinion, the witness may be cross–examined in regard to the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication only if:

(1) The witness referred to, considered, or relied upon such publication in arriving at or forming the witness' opinion, or

(2) Such publication qualifies for admission into evidence under rule 803(b)(18).

> Such a broad testimonial range suggests the need for an equally broad cross–examination, and subsection (a) of this rule provides the appropriate latitude.

Based on HRE Rule 702.1, we concluded, in *State v. Young*, 8 Haw. App. 145, 152, 795 P.2d 285, 290, *cert. denied*, 71 Haw. 669, 833 P.2d 901 (1990), that a trial court should permit an expert witness to be extensively cross–examined about any books, articles, periodicals, studies, and lectures which the expert relied upon in forming an opinion.

In the instant case, Dr. Henrickson testified that his opinion as to the nature of Rose's injuries was based partly on information he gained at a lecture he attended at an American Back Society seminar. According to Dr. Henrickson, membership in the society was important because it provided continuing education:

> [W]e meet once a year to discuss all the current ways of treating back injuries and review the current therapies of how back injuries and neck injuries occur. This is a group of all types of health care providers. It's not just surgeons, it's osteopaths, chiropractors and therapists and by [sic] mechanical engineers[,] we have lawyers there, nurses. We have meetings once a year and we get the latest data, what's coming out in the future.

Tr. 9/27/90 at 65.

It is well–recognized that expert witnesses "bring to their forensic roles educational backgrounds derived from books, periodicals, and lectures." A. BOWMAN, HAWAIʻI RULES OF EVIDENCE MANUAL § 703–2, at 69–70 (Cum. Supp. 1993). Indeed, it has been held that an expert should be allowed to testify about any knowledge derived from

lectures and conversations with colleagues which helped him form an expert opinion, since "[i]t is by assimilation of hearsay of this sort that expert opinions are in fact, for the most part, made[.]" *Jefferis v. Marzano*, 298 Ore. 782, 790, 696 P.2d 1087, 1092 (1985).

In the instant case, the trial court determined that information gained by Dr. Henrickson at a lecture was of the type reasonably relied upon by experts in his field in forming opinions about back injuries. Plaintiffs were given ample opportunity to cross–examine Dr. Henrickson about the bases for his opinion. We are unable to conclude under such circumstances that the trial court abused its discretion in allowing such testimony.

### 3. *Prejudicial Effect of Dr. Henrickson's Testimony*

Plaintiffs argue that since Dr. Henrickson's I.M.E. report failed to mention the low–velocity impact theory, they were foreclosed from effectively cross–examining Dr. Henrickson about the theory and were thus unduly prejudiced by the testimony. They claim that the prejudicial effect of such testimony outweighed its probative value and thus should not have been allowed.

However, Plaintiffs failed to raise this objection at trial. Furthermore, Plaintiffs acknowledge receiving Dr. Henrickson's I.M.E. report in the course of pretrial discovery. O.B. at 14. In his I.M.E. report, Dr. Henrickson specifically stated:

> It appears the first [accident] was a low–velocity collision with very little damage to the rear bumper of their Mercedes. The patient did not seek medical attention for a long period of time following this accident. In medical probability, she had a mild soft tissue injury related to this

accident and this was aggravated by sitting while working for her husband.

R.A., volume 4 at 213. Plaintiffs had every opportunity to request, through interrogatories or depositions, that Dr. Henrickson state the grounds for his opinion. HRCP Rules 26(b)(4)(A)(i) and 30. If Plaintiffs neglected to do so,[7] they cannot now complain about prejudice to them in the admission of Dr. Henrickson's testimony.

## III.

### *Denial of Plaintiffs' Motion for New Trial*

Plaintiffs contend that the trial court erred in denying their motion for new trial because there was overwhelming evidence that Rose sustained injuries as a consequence of the November 26, 1986 collision.

A motion for new trial is governed by Hawai'i Revised Statutes § 635–56 (1985) which provides:

> **Grounds for new trial.** In any civil case or in any criminal case wherein a verdict of guilty has been rendered, the court may set aside the verdict when it appears to be so manifestly against the weight of the evidence as to indicate bias, prejudice, passion, or misunderstanding of the charge of the court on the part of the jury; or the court may in any civil or criminal case grant a new trial for any legal cause.

Absent a showing of an abuse of discretion by the trial judge, a denial of a motion for new trial will not be disturbed on appeal. *Wiegand v. Colbert*, 68 Haw. 472, 718 P.2d 1080 (1986). A new trial may be granted where the

---

[7] None of the depositions taken in this case were introduced into evidence or included in the record on appeal.

movant's evidence manifestly outweighs the evidence introduced by the other party. *Stahl v. Balsara*, 60 Haw. 144, 152, 587 P.2d 1210, 1215 (1978). However, where the ground for a motion for new trial is that the verdict is against the weight of the evidence and there is substantial evidence, more than a mere scintilla to support the verdict, the trial court should not grant the motion for new trial. *Lovell Enterprises, Inc. v. Campbell–Burns Wood Products, Inc.*, 3 Haw. App. 531, 541, 654 P.2d 1361, 1368 (1982).

In denying Plaintiffs' motion for a new trial, the trial judge stated in pertinent part:

> When we go to generally the question of whether the manifest weight of the evidence calls for a new trial in this case, I don't find that to be the case here. . . . There was evidence in this case concerning prior activities on the part of the plaintiff and subsequent action on the part of the plaintiff that well could have — well does support the jury's finding of a lack of probable cause in this particular accident particularly because this accident was of such a minor nature. I cannot disagree with the verdict of the jury. And on that basis alone the motion for new trial should be denied.

Tr. 12/3/90 at 19–20.

The record provides substantial evidence to support the jury's verdict that the November 26, 1986 accident was not the legal cause of any injuries suffered by Rose. Rose testified that she was a passenger in a Mercedes Benz 300 turbo sedan and was wearing her seat belt when the accident occurred. St. Peter was driving a Buick Regal and testified that when the accident occurred, she was

traveling at a speed of two or three miles per hour. The collision caused minimal damage to both automobiles.[8] In fact, Plaintiffs traded in their car without making any repairs. Tr. 9/24/90 at 177. In addition, Rose told Dr. Henrickson that the car was "hit a little bit." Tr. 9/27/90 at 85.

Furthermore, at the time of the accident, Rose declined medical attention. Tr. 9/25/90 at 132. Rose testified that although her back felt tired after the accident, Tr. 9/24/90 at 143–47, she did not feel any pain until the end of January 1987. Tr. 9/25/90 at 141. Rose also admitted that she had occasionally experienced a tired back even before the accident. Tr. 9/25/90 at 137–38.

It was not until February 25, 1987 that Rose first sought medical attention from Dr. Lau. Although Rose testified that she told Dr. Lau that she had been in a car accident, Tr. 9/24/90 at 150, Dr. Lau's medical records show no indication of such information. Tr. 9/27/90 at 115. Dr. Lau diagnosed Rose as having a tight hamstring and prescribed an anti–inflammatory drug. Tr. 9/25/90 at 138–39.

Approximately seven months after the accident, Dr. Nakano. performed both physical and neurological tests on Rose, including an EMG, which failed to reveal any abnormalities. Tr. 9/26/90 at 137–38. It was not until sixteen months after the accident, when Dr. Wu performed a second EMG on Rose, that an abnormality or irritation of the L5 nerve root was revealed. Tr. 9/25/90 at 37; Tr. 9/26/90 at 20. However, both Drs. Nakano and Henrickson testified that the pain described by Rose was not

---

[8] Rose testified that after the accident, she noticed that the bumper of her car was scratched and that a light on St. Peter's car was broken. Tr. 9/24/90 at 176–77.

consistent with the L5 abnormality found by Dr. Wu. Tr. 9/26/90 at 147; Tr. 9/27/90 at 80–82.

After conducting an I.M.E. and reviewing Rose's prior medical records, Dr. Henrickson testified that it was his medical opinion that Rose's injuries stemmed from prolonged sitting. Tr. 9/27/90 at 78, 83. Furthermore, Dr. Henrickson testified that a normal EMG in June of 1987, approximately seven months after the collision, and an abnormal EMG in March 1988, sixteen months after the accident, would indicate that nothing was wrong with Rose's nerve in 1987, and that something had irritated the nerve by the time the 1988 EMG was taken. Tr. 9/27/90 at 82.

In light of the minor nature of the accident and the foregoing testimony, the jurors could have concluded that Rose's injuries were not caused by the November 26, 1986 accident. The record clearly provides substantial evidence to support the jury's verdict. Therefore, the trial court did not abuse its discretion in denying Plaintiffs' motion for new trial.

Affirmed.

*Ronald G.S. Au* (*Gerald H. Kurashima* and *Barbara A. Fabrey* with him on the opening brief; *Gerald H. Kurashima* with him on the reply brief) for plaintiffs–appellants.

*James P. Dandar* (*Janice Wolf* with him on the brief) for defendant–appellee Jeannine St. Peter.

*Paul T. Yamamura* (Ortiz & Yamamura, of counsel) on the brief for defendant–appellee John Kott.