881 P.2d 1277

**Evelyn SWINK, Plaintiff–Appellant,**

**v.**

**Maxwell A. COOPER, M.D., Defendant–Appellee,**

**and**

**Straub Clinic & Hospital, Inc., and Does 1 through 50, inclusive, Defendants.**

**No. 15852.**

Intermediate Court of Appeals of Hawai'i.

Sept. 30, 1994.

Gary Victor Dubin, on the briefs, Honolulu, for plaintiff-appellant.

Arthur F. Roeca (Keith K. Hiraoka and Daniel T. Kim, with him on the briefs; Roeca, Louie & Hiraoka, of counsel), Honolulu, for defendant-appellee.

Before BURNS, C.J., and HEEN and WATANABE, JJ.

WATANABE, Judge.

In this medical malpractice case, Plaintiff–Appellant Evelyn Swink (Plaintiff) appeals from the October 14, 1991 judgment entered against her by the First Circuit Court pursuant to a jury's verdict in favor of Defendant–Appellee Dr. Maxwell Cooper (Dr. Cooper).[1] According to Plaintiff, the circuit court reversibly erred when it: (1) improperly curtailed the trial testimony of Plaintiff's expert witness, Dr. Susan Hughes (Dr. Hughes); and (2) improperly allowed Defendant's expert witness, Dr. James Carraway (Dr. Carraway), to testify at trial even though he had never personally examined Plaintiff.[2]

We find no error and accordingly affirm.

## FACTS AND PROCEDURAL HISTORY

On June 18, 1982, Plaintiff went to see Dr. Cooper, a board-certified general surgeon and plastic and reconstructive surgeon, regarding a slight droop in her left eyelid, a condition known as "ptosis."[3] Dr. Cooper determined that Plaintiff had a two-millimeter degree of ptosis and recommended that she undergo a corrective surgical procedure called "Fasanella–Servat."[4] Dr. Cooper also advised Plaintiff that he had never personally performed the particular surgery before, but

---

1. Straub Clinic & Hospital was originally named as a co-defendant in this lawsuit, but was subsequently dismissed with prejudice by Plaintiff. Record on Appeal (R.A.) volume 1 at 103–04.

2. In her amended opening brief, Plaintiff also alleges that the circuit court abused its discretion when it denied her motion for new trial. In view of our disposition of this appeal, however, we find no abuse of discretion by the trial court in entering the order.

3. The word "ptosis," which is derived from the Greek word meaning "fall," refers to the slipping down, drooping, or sagging of an organ or structure, especially a drooping of the upper eyelid due to paralysis of the (oculomotor) nerve which operates it. R. Sloane, *The Sloane–Dorland Annotated Medical–Legal Dictionary* 593 (1987); J.E. Schmidt, *Attorney's Dictionary of Medicine and Word Finder*, vol. 3, P–369 (1994).

4. According to the testimony of the experts at trial, the Fasanella–Servat procedure is the simplest surgery to correct eyelid ptosis. It involves flipping the patient's eyelid up, then shortening the eyelid by trimming a small piece of tarsal plate, conjunctiva, and Mueller's muscle from the eyelid. Dr. Cooper recommended this particular procedure because it is an internal procedure which does not leave a scar on the outer portion of the eyelid. Since Plaintiff was a professional model, she did not want any scars on her face. Testimony of Dr. James Howard Carraway (Dr.

did have experience in cosmetic eyelid surgeries of equal or greater magnitude and was willing to perform the surgery for her at a reduced price. He further discussed with Plaintiff the potential risks of such surgery, which included bleeding, infection, blindness, and an uneven result.

Plaintiff agreed to have Dr. Cooper perform the surgery and executed an informed consent form, acknowledging the risks of such surgery. On July 9, 1982, Dr. Cooper performed his first surgery on Plaintiff's eyelid in his office. Unfortunately, the amount of ptosis in Plaintiff's eyelid did not improve. Accordingly, Dr. Cooper referred Plaintiff to Dr. Vernon Jim (Dr. Jim), who is a board-certified ophthalmologist and plastic surgeon, for an evaluation and second opinion as to whether or not it was medically indicated to reoperate.

Dr. Jim examined Plaintiff on August 11, 1982, at which time Plaintiff had 20/20 vision in both eyes and normal test results. Transcript (Tr.) 10/8/91 at 130–31. Dr. Jim recommended that Plaintiff wait for about six months before repeating a Fasanella–Servat procedure to correct the residual ptosis.

On January 12, 1983, Dr. Cooper performed a second Fasanella–Servat surgery on Plaintiff. Plaintiff testified that post-operatively, she experienced pain, burning, scratching, heaviness, and loss of control of her left eyelid. However, Dr. Cooper's medical records reflect that Plaintiff's only complaint was that the outer portion of her eyelid was still not completely corrected, and Plaintiff wanted Dr. Cooper to reoperate.

Dr. Cooper then referred Plaintiff to Dr. Jim and Dr. Jorge Camara (Dr. Camara) to determine whether it was medically reasonable to repeat another Fasanella–Servat procedure. When Dr. Jim examined Plaintiff on March 10, 1983, he did not find anything abnormal other than a minimal residual ptosis of one millimeter or less, which was less than what Plaintiff had previously. Dr. Jim

noted that Plaintiff seemed "overanxious to get a perfect result." Tr. 10/8/91 at 138. He advised Plaintiff to wait for six months before undergoing further surgery.

Dr. Camara, a board-certified ophthalmologist, examined Plaintiff on March 15, 1983. Although Plaintiff's vision and levator muscle function were a little decreased in her left eye compared to the right, and she complained of dizziness during a test for extraocular motion, she had no abnormal findings or complaints at the time. Dr. Camara measured the amount of ptosis at two millimeters, and felt that further surgery on Plaintiff's eyelid was not contraindicated. In a letter to Dr. Cooper dated March 21, 1983, Dr. Camara stated that he felt "the best mode of correction would be doing a Fasanella–Servat procedure under frontal block." Tr. 10/8/91 at 17.

Following Plaintiff's office visit with Dr. Cooper on May 12, 1983, Dr. Cooper noted that Plaintiff was "[r]elaxed, relatively, and happy with care.... Wants lateral lid lifted further. Likes central and medial." Tr. 10/8/91 at 18. They discussed scheduling for another eyelid surgery, but Plaintiff later called Dr. Cooper's office to postpone surgery indefinitely.

It was not until March 14, 1986, almost three years later, that Dr. Cooper saw or heard from Plaintiff again in his office. During this office visit, Plaintiff did not complain about any problems with her eye or her vision, but she felt that more lateral lift of the eyelid was needed.

On April 29, 1986, Dr. Cooper performed a third surgery on Plaintiff's left eyelid. Postoperatively, Plaintiff did not report any problems with her vision or her eye, but she still felt that the ptosis was not fully corrected. Dr. Cooper thereafter referred Plaintiff to Dr. Camara.

When Dr. Camara examined Plaintiff on December 16, 1986, Plaintiff indicated that

Carraway), Transcript (Tr.) 10/4/91 at 23–25; testimony of Dr. Susan Marie Hughes (Dr. Hughes),

Tr. 10/7/91 at 16–19.

her left eye felt heavier, but she did not report any problems with her eye or her vision. At this time, Plaintiff and Dr. Camara discussed doing a levator resection to correct the ptosis.[5]

On January 16, 1987, Dr. Camara performed a levator resection on Plaintiff at Straub Hospital. Dr. Cooper was present during the procedure as an assistant, but made no incisions or surgical decisions. During the surgery, Dr. Camara did not observe any unusual scarring or abnormalities from Dr. Cooper's previous surgeries. Immediately after the operation, Plaintiff complained of a great amount of pain in her left eye, and she was upset about the care she received at Straub. In the days following the surgery, Plaintiff reported severe itching and swelling.

When Dr. Camara examined Plaintiff again on February 11, 1987, the amount of ptosis was half a millimeter. However, Plaintiff indicated that her left eyelid did not open all the way, and she reported intermittent pain and headaches.

On March 5, 1987, Plaintiff went to Dr. Cooper's office and reported double vision when looking upwards. Dr. Cooper noted that her ptosis appeared to be a little worse than it had been before the levator resection surgery.

When Dr. Camara examined Plaintiff on August 18, 1987, she reported having double vision, which Dr. Camara suspected was caused by adhesions between the superior rectus and levator muscles.

Plaintiff was subsequently examined on September 21, 1987 at Wills Eye Hospital in Philadelphia by Dr. Susan Hughes (Dr. Hughes), a board-certified ophthalmologist and oculoplastic and reconstructive surgeon. Plaintiff reported ptosis, double vision on upward gaze, and a mass in her left eyelid, and Dr. Hughes could feel a mass in Plaintiff's left eye. Dr. Hughes advised Plaintiff not to have further surgery, but Plaintiff insisted that Dr. Hughes perform an operation to remove the mass and correct the ptosis, even at the risk of worsening her double vision.

Plaintiff subsequently underwent three more levator resections. During the first surgery on September 22, 1987, Dr. Hughes found extensive scar tissue in the eye and removed most of the mass in the eyelid. However, Plaintiff still had ptosis. During the second surgery on September 29, 1987, Dr. Hughes found that scar tissue had caused the superior rectus and levator muscles to adhere to each other, which Dr. Hughes attributed as the source of Plaintiff's double vision. During this second procedure, the scar tissue was separated surgically. A third surgery was performed on October 7, 1987 to correct the residual ptosis.

After the three levator resections by Dr. Hughes, Plaintiff reported that she could not completely close her left eye, she continued to have double vision and more ptosis than before, and she was legally blind in the left eye.

On January 9, 1989, Plaintiff filed a complaint against Defendants Dr. Cooper and Straub Clinic & Hospital for damages based on negligence, intentional and negligent misrepresentation, and failure to obtain informed consent. Following a trial commencing on September 30, 1991, the jury returned a Special Verdict finding that Dr. Cooper was not negligent in his medical care and treatment of Plaintiff.[6] The circuit court entered judgment in favor of Dr. Cooper on October 14, 1991, and subsequently denied Plaintiff's motion for a new trial on December 17, 1991. This appeal followed.

---

5. A levator resection is a more complicated procedure than a Fasanella–Servat procedure, involving several layers of tissue, and is approached from the external surface of the eyelid. Dr. Cooper testified that because he did not perform levator resections, he referred Plaintiff to Dr. Camara.

6. The trial court minutes indicate that a verdict was directed in Dr. Cooper's favor on the informed consent claim. We have been unable to determine from a review of the record on appeal, however, what became of the claim against Dr. Cooper based on intentional and negligent misrepresentation.

## DISCUSSION

### I.

*Limitation of Dr. Hughes' Trial Testimony*

■ During her deposition, Dr. Hughes opined that Dr. Cooper had violated the standard of care in two ways: (1) he should not have repeated the Fasanella–Servat procedure; and (2) he used poor surgical technique in performing the procedure without the use of clamps. Tr. 10/7/91 at 23. When asked whether she had "any other opinions regarding the manner in which Dr. Cooper cared for Miss Swink ... [which] indicated he fell below the standard practice of other than the opinions [Dr. Hughes] ha[d] already stated," Dr. Hughes answered in the negative. *Id.*

Prior to trial, Dr. Cooper filed a motion *in limine* to prohibit Dr. Hughes from testifying at trial about any new opinions or conclusions which she had not expressed at her deposition. The trial court granted the motion, and the following discussion occurred:

THE COURT: The motion will be granted but with this proviso. The witness will be allowed to testify as to her opinion regarding standard of care and damages. What I don't want happening is a brand new subject matter being brought up. If you are dealing in semantics and inunderstanding [sic] words in the deposition, that's an area for impeachment.

[PLAINTIFF'S COUNSEL]: For clarification, if I may, then, Your Honor, then the motion in limine is granted as to prohibiting Dr. Hughes from testifying as to any new subjects that weren't covered in the deposition.

THE COURT: That states it pretty fairly, I think.

[DR. COOPER'S COUNSEL]: Or render new opinions about new subjects.

[PLAINTIFF'S COUNSEL]: I assume that's the same thing.

THE COURT: The same.

Tr. 9/30/91 at 13–14.

During trial, counsel for Dr. Cooper objected in advance to the direction in which Dr. Hughes' testimony was heading, which appeared to criticize Dr. Cooper for selecting the Fasanella–Servat procedure. The trial court sustained the objection, stating that "[i]f [Dr. Hughes is] saying [Dr. Cooper] violated the standard of care in three regards, then her opinion has gone beyond what has been specified in the deposition." Tr. 10/7/91 at 58.

Plaintiff argues that the trial court's partial preclusion of Dr. Hughes' testimony constituted an abuse of discretion. We disagree.

Hawaiʻi Rules of Civil Procedure (HRCP) Rule 26(b)(4)(A)(i) requires parties to an action to disclose "the subject matter on which the[ir] expert [witness] is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." Furthermore, HRCP Rule 26(e)(1)(B) [7] imposes a continuing obligation on a party to seasonably supplement responses to discovery requests regarding expert witnesses.

In attempting to proffer Dr. Hughes' testimony that Dr. Cooper had violated the standard of care in selecting the Fasanella–Servat procedure, Plaintiff was in essence attempting to introduce an alternative theory of liability at trial. Since Dr. Hughes testified at her deposition that Dr. Cooper had violated the standard of care in only two

---

7. Hawaiʻi Rules of Civil Procedure (HRCP) Rule 26(e)(1)(B) provides:

    **(e) Supplementation of Responses.** A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

    (1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to ... (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.

respects and such testimony was never supplemented by Plaintiff prior to trial to include a third theory of liability, HRCP Rule 26(e)(1)(B) was clearly violated.

The question, therefore, is whether the trial court abused its discretion when it sanctioned such violation by precluding Dr. Hughes from testifying at trial about the alternative theory of liability. We conclude that it did not.

■ We note initially that the 1970 Advisory Committee which drafted the current version of Federal Rules of Civil Procedure (FRCP) Rule 26(e), upon which HRCP Rule 26(e) is modeled, anticipated that Rule 26(e) violations would be enforced by the exclusion of evidence at trial. In its committee notes with respect to Rule 26(e), the Advisory Committee stated:

> The duty [to supplement] will normally be enforced, in those limited instances where it is imposed, through sanctions imposed by the trial court, including exclusion of evidence, continuance, or other action, as the court may deem appropriate.

Notes of Advisory Committee on 1970 amendments to FRCP Rule 26(e), 28 U.S.C.A. Rule 26 at 33.

Furthermore, case law in other jurisdictions supports the notion that a trial court has wide discretion to exclude an expert witness' testimony when a party has failed to supplement the expert's discovery responses. In *Radmer v. Ford Motor Co.,* 120 Idaho 86, 813 P.2d 897 (1991), for example, the Supreme Court of Idaho held that a trial court committed reversible error when it allowed the plaintiffs' expert witness to testify about a completely new theory of liability at trial, since plaintiffs had failed to supplement the expert's discovery responses prior to trial, thus preventing the defendant from effectively challenging the expert's testimony. *Id.* at 89, 813 P.2d at 900–02. *See also Alimenta (U.S.A.), Inc. v. Anheuser–Busch Cos.,* 803 F.2d 1160, 1163 (11th Cir.1986); *Holiday Inns, Inc. v. Robertshaw Controls Co.,* 560 F.2d 856, 858 (7th Cir.1977); *Barnes v. St.*

*Francis Hosp. and School of Nursing, Inc.,* 211 Kan. 315, 320–21, 507 P.2d 288, 293–94 (1973).

In the instant case, trial was already in progress when Dr. Hughes was prevented from testifying about a third theory regarding Dr. Cooper's liability. Since Dr. Cooper had no advance knowledge about Dr. Hughes' alternate theory and was thus not prepared to cross-examine her on the bases for her opinion, it was within the bounds of sound judicial discretion for the trial court to have excluded Dr. Hughes' testimony concerning such theory.

## II.

### *Admissibility of Dr. Carraway's Expert Testimony*

■ At trial, Dr. Carraway, after being qualified as an expert in plastic and reconstructive surgery with a subspecialty in oculoplastic surgery (surgery of the eyelid and orbital area), testified about the standard of care for the Fasanella–Servat procedure. Dr. Carraway expressed his opinion that Dr. Cooper performed the procedure properly and that the formation of scar tissue and adhesions in Plaintiff's eye had not been caused by Dr. Cooper's surgeries. On cross-examination, Dr. Carraway admitted that he had not personally examined Plaintiff, but had obtained information about Plaintiff's injuries from reading her medical records and the deposition of other witnesses, including that of Dr. Cooper.

Plaintiff argues that the trial court should not have allowed Dr. Carraway's testimony because it was based on hearsay notes of other physicians, speculation, and matters not in evidence, rather than on personal observations. Amended Opening Brief at 6–7.

■ "The admission of expert testimony, however, is a matter resting within the discretion of the trial court, and only an abuse of that discretion can result in reversal." *Lai v. St. Peter,* 10 Haw.App. 298, 308, 869

P.2d 1352, 1359 (1994). Our review of the record in this case reveals no abuse of discretion, and Plaintiff's argument is without merit.

■ Hawai'i Rules of Evidence (HRE) Rule 703 [8] has liberalized the bases for expert testimony, and an expert is allowed to express an opinion based on facts or data which are not admissible into evidence if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[.]" HRE Rule 703. An expert's opinion may thus be based on even inadmissible evidence, including hearsay. *Lai*, 10 Haw.App. at 309, 869 P.2d at 1359.

In the instant case, Dr. Carraway based his opinions on the medical records, clinical notes, and operative reports of Dr. Cooper, Dr. Camara, and Dr. Hughes, and the medical records of Dr. Jim. All of these were admitted into evidence during the trial. In addition, Dr. Carraway referred to photographs that were received into evidence. Under such circumstances, the trial court did not abuse its discretion in allowing Dr. Carraway to testify.

Affirmed.

---

**8.** Hawai'i Rules of Evidence (HRE) Rule 703 provides:

> **Bases of opinion testimony by experts.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.