#23652-rev & rem-DG

**2006 SD 95**

IN THE SUPREME COURT<br>OF THE<br>STATE OF SOUTH DAKOTA

* * * *

TOM KAISER and LAURA KAISER,   Plaintiffs and Appellants,

 v.

UNIVERSITY PHYSICIANS CLINIC,
and ELIZABETH DIMITRIEVICH,   Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF<br>THE SECOND JUDICIAL CIRCUIT<br>MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE WILLIAM J. SRSTKA, JR.<br>Judge

* * * *

RONALD A. PARSONS, Jr.
SCOTT A. ABDALLAH of
Johnson, Heidepriem, Miner,
 Marlow & Janklow, LLP
Sioux Falls, South Dakota
 and
MARK W. McNEARY of
McNeary & Anderson
Aberdeen, South Dakota     Attorneys for appellants.

MELISSA HINTON
EDWIN E. EVANS
TIMOTHY M. GEBHART of
Davenport, Evans, Hurwitz & Smith
Sioux Falls, South Dakota     Attorneys for appellees.

* * * *

ARGUED APRIL 26, 2006

OPINION FILED <b>11/01/06</b>

#23652

GILBERTSON, Chief Justice

[¶1.] Tom and Laura Kaiser (Kaisers) brought a medical malpractice action against University Physicians Clinic and Elizabeth Dimitrievich, M.D. (Defendants). A jury verdict was rendered in favor of Defendants. Kaisers appeal contending the circuit court erred when it admitted a previously undisclosed exhibit into evidence, allowed the use of two other previously undisclosed exhibits for illustrative purposes, and ruled that Defendants' expert witness could testify about the exhibits to the jury. We reverse and remand for a new trial.

## FACTS AND PROCEDURE

[¶2.] Laura and Tom were married in June 1999, and began trying to conceive a child a year after their marriage. The couple was unable to conceive and sought the assistance of an obstetrics and gynecology (OB-GYN) specialist in Aberdeen, South Dakota. Several attempts with intrauterine (artificial) insemination failed to result in a pregnancy. The couple moved to Sioux Falls, South Dakota, in August of 2000. In early 2002, the couple scheduled an appointment with Keith Hanson, M.D., a fertility specialist in Sioux Falls, to resume trying to start their family. However, the day before the appointment Laura discovered she was already pregnant.

[¶3.] Laura remained under Hanson's care through her first trimester and was then referred to Elizabeth Dimitrievich, M.D., a board-certified OB-GYN specialist at University Physicians Clinic in Sioux Falls. The pregnancy progressed fairly normally except the baby was in a breech position during most of the pregnancy. Laura's due date was calculated as September 20, 2002.

[¶4.] On Monday, September 16, 2002, Laura saw Dimitrievich for a rash. While at Dimitrievich's office, Laura's blood pressure became slightly elevated and she began having a contraction. Dimitrievich decided to schedule a cesarean section (c-section) for the following morning. Later that evening, Laura began experiencing tightness around her chest and rib cage and telephoned Dimitrievich. Dimitrievich advised Laura to meet her at Sioux Valley Hospital for an evaluation.

[¶5.] After examining Laura, Dimitrievich determined that Laura was in early labor. She also determined that Laura had a borderline temperature and an elevated pulse rate of 112 beats per minute. Dimitrievich ordered a complete blood count (CBC), which showed a high white count of 20,000[1] and a "left shift." The "left shift" gave Dimitrievich concern that Laura might have a bacterial infection. Given these findings and the baby's breech presentation, Dimitrievich determined that an immediate c-section was required. Dimitrievich ordered a dose of ampicillin, a broad spectrum penicillin, prior to the c-section to cover the possibility of a bacterial infection.

[¶6.] At 1 a.m. on Tuesday, September 17, 2002, Spencer Kaiser was delivered by c-section, weighing nine pounds and five ounces. Following the birth, Dimitrievich brought the uterus outside the abdominal cavity per her standard

---

1. A normal white count is between 4,500 and 10,000 cells per microliter. Potential common causes of an elevated white count include: infection; certain medications, such as corticosteroids, antibiotics or anti-seizure drugs; severe physical or emotional stress; chronic bone marrow diseases such as a myeloproliferative disorder; and acute or chronic leukemia. A high white count does not identify a specific problem. Instead, it may indicate an underlying condition. http://www.mayoclinic.com/health/high-white-blood-cell-count/AN00372 (last visited April 6, 2006).

practice in order to repair the c-section incision. The procedure was routine except Dimitrievich noticed an abnormal vein above the incision in a place blood vessels are normally not seen. Dimitrievich believed the vein was bleeding, so she sutured it. However, the stitches she put in caused more bleeding and Dimitrievich applied a product that assists in halting bleeding. Once the bleeding ceased, Dimitrievich placed the uterus back in the abdominal cavity. Dimitrievich then ordered antibiotics for an additional twenty-four hours after the c-section due to Laura's previously elevated heart rate, white blood cell count, and the bleeding from the uterine abnormality. Because the c-section had been routine, Dimitrievich did not send the placenta to the pathology laboratory for biopsy and it was discarded per routine hospital procedures.

[¶7.]     Laura's recovery appeared to be progressing normally until Thursday, September 19, approximately two days after the surgery. Laura vomited and reported she felt "like things weren't moving inside," that she felt bloated and nauseous, and that her stomach was hardening. Dimitrievich ordered a change from a normal diet to a liquid diet, suspecting an ileus – a dysfunction of the bowel common after surgical procedures. On Saturday, September 21, Laura spiked a fever of 102.2 degrees Fahrenheit. Dimitrievich ordered a dose of triple antibiotics and demerol for the pain. Later that evening, Dimitrievich called Maria Bell, M.D., a gynecologist with a subspecialty in gynecological surgery, for a surgical consult.

[¶8.]     After examining Laura on Monday, September 23, Bell advised her that if she did not improve on the antibiotic treatment in the next twenty-four hours, exploratory surgery would be necessary. On Tuesday, September 24, Bell

along with surgeon Robert George, M.D., performed exploratory surgery on Laura to determine the cause of her symptoms.

[¶9.]    The surgeons discovered a massive infection in Laura's peritoneal cavity. The peritoneal cavity and the surface of her organs, including her uterus, bowels, liver and spleen were covered in pus and extensive adhesions, a condition known as peritonitis. Bell and George examined the large and small intestine visually and by "running," meaning examining by hand, the small intestine and most of the large intestine for evidence of injury. No injury to either the large or the small intestine was found, nor did the surgeons find any sign of an injury that might have occurred during the c-section and subsequently healed over. According to George, there were so many adhesions and so much pus that it was not possible to determine whether an injury had occurred.

[¶10.]    After cleaning out the peritoneal cavity as best they could, Bell and George concluded that it was necessary to perform a total hysterectomy to remove the uterus, cervix, ovaries and fallopian tubes. Laura's appendix was also removed. Bell made the decision to remove the organs because of concerns the organs might be the source of the infection, and that it would not clear up if they were left inside the peritoneal cavity. No portions of the large or the small intestine were removed.

[¶11.]    Organ tissues and cultures from the infected peritoneal fluid were sent to the pathology laboratory for testing. The pathology report indicated that two of eleven samples taken from Laura's uterus contained microscopic spots of "foreign

vegetable matter" measuring six to seven microns[2] each embedded in the surface of the uterine tissue. The pathologist was able to identify it as plant or vegetable matter due to the cell walls of the material, as only plant or vegetable matter has such cell wall formations. However, the vegetable matter could not be identified as partially digested food, nor could its source be determined from the limited samples taken from the uterus. The only definitive determination that could be made was that it was of plant origin as opposed to animal or mineral in origin. The vegetable matter embedded in the uterus was determined not to be the source of the infection, as very little pus was present at their respective locations. Based on the cultures of the peritoneal fluid it was determined that two bacteria normally found in the large intestine, *Bacteroides uniformis* and *Klebsiella oxytoca*, were present in the peritoneal cavity. However, because the placenta had already been disposed of, no further pathological testing could be performed in an attempt to identify the source and cause of the infection, or the nature of the vegetable matter found on the uterus.

[¶12.] Laura recovered from the infection and was discharged from the hospital four days after the surgery. She suffered a recurrence of the infection that resulted in a pelvic abscess. However, it was treated without surgical intervention and she recovered.

---

2. A micron is a unit of measure equal to one thousandth ($10^{-3}$) of a millimeter or one millionth ($10^{-6}$) of a meter. American Heritage College Dictionary 861 (3d ed. 1997). The approximate equivalent is .000039 of an inch. http://www.m-w.com/mw/table/metricsy.htm (last visited April 7, 2006).

[¶13.] In August 2003, Tom and Laura brought suit against Defendants alleging medical malpractice. Kaisers' theory of the case was that Dimitrievich had perforated Laura's bowel during the c-section and that leakage from the bowel had caused the massive infection. Kaisers contended that the presence of the vegetable matter on the surface of Laura's uterus was a marker that indicated leakage from the bowel had occurred. Kaisers also theorized that the presence of the two bacteria commonly found in the bowel were evidence of the perforation. Although no evidence of a perforation was found by Bell and George when they ran the bowels during the exploratory surgery, Kaisers' theory was that a small perforation caused by Dimitrievich spontaneously healed over after fecal matter was released into the peritoneal cavity.

[¶14.] Defendants' theory of the case was that Dimitrievich did not injure Laura's bowel during the c-section. Defendants contended the vegetable matter had been present since before the c-section and its identification as "vegetable" did not identify its source, nor indicate it was food matter ingested by Laura. Identification as vegetable matter only indicated its general character as not being of animal or mineral origin but rather of plant origin. Defendants argued that the source of the vegetable matter was not relevant to the infection as it predated the c-section by at least one week and possibly up to several months.

[¶15.] Defendants argued the bacteria found in the culture were common but not unique to the bowel and offered two theories on how the bacteria could have entered Laura's peritoneal cavity: contaminated amniotic fluid or an ascending vaginal infection resulting from cross-contamination from the anus. Defendants also argued that if there had been a bowel injury, Laura would have become ill

within twenty-four to forty-eight hours, with seventy-two hours as the outermost range for an illness to develop after the surgery, rather than almost five days after the surgery.

[¶16.]     On June 8, 2004, as part of the discovery process, Kaisers served a request for production of documents (third set) concerning expert witnesses. The request asked Defendants to produce (a) a complete copy of each witnesses' files, (b) a copy of all photographs or other images made in reviewing the case, and (c) copies of any and all other documents, records, notes, and written material in possession of expert witnesses in relation to investigation, analysis and opinions in the matter. Eleven physicians were deposed in preparation for the trial, including the Defendants' pathology expert witness, Dale Snover, M.D., who was deposed on September 8, 2004. In December 2004, Kaisers filed a motion to compel discovery after Defendants refused to provide general literature and other materials relied upon by their experts.

[¶17.]     A hearing was held on the matter on January 4, 2005. Defendants argued that no such general literature was in their possession or was being relied upon by Snover as the basis for his opinion. Instead, Snover's expert testimony was based on his years as a practicing surgical pathologist. The circuit court noted at the hearing that Snover's reliance on his experience for his expert testimony went to his credibility and the weight of his opinion. The circuit court also noted that if Snover arrived at trial and testified to general literature upon which he had relied, then Kaisers were free to use his deposition testimony to the contrary to impeach his credibility. The circuit court then ordered Defendants to provide whatever new material they had within ten (10) days of their receipt of the same. Both parties

agreed to supplement any material upon which their respective experts were relying within ten days of receipt.

[¶18.] Snover's deposition testimony focused on the vegetable matter found on Laura's uterus and how long it had been present prior to the c-section. Snover testified that the vegetable matter was surrounded by giant cells, cells that form in the presence of a foreign body and attempt to break it down at a cellular level using enzymes and destroy or eliminate it from the body. He further testified that the giant cells had not simply surrounded the vegetable matter, but had infiltrated it in order to break it apart. Snover testified that the presence and actions of the giant cells provided evidence that the vegetable matter had been present on Laura's uterus for more than a week prior to the c-section. He estimated it had been present for a month to several months prior to the c-section, and possibly longer. Snover further testified that he did not know the source of the vegetable matter, but that the source was irrelevant to his conclusion that it had been present prior to the date of the c-section. Snover conceded that the two bacteria identified in Laura's peritoneal fluid are most commonly found in the bowel.

[¶19.] Kaisers' experts testified during depositions that the presence of giant cells was either not significant or that the vegetable matter had to have been deposited during the c-section. Kaisers' experts noted that vegetable matter is not natural to the surface of the uterus and had to have come from somewhere. They identified the most likely source was the bowel via a perforation made by Dimitrievich at the time of the c-section. Kaisers' experts did not eliminate the possibility that an ascending infection from the vaginal tract or a post-operative infection at the site of the surgical incision could have caused the massive infection.

However, Kaisers' experts testified that in their opinion the more likely scenario was a perforation of the bowel at the time of the c-section given the presence of both the vegetable matter and the two bacteria *Bacteroides uniformis* and *Klebsiella oxytoca*.

[¶20.]    The case was tried to a Minnehaha County jury on March 15-25, 2005. On Monday, March 21, 2005, the morning of the sixth full day of trial, Snover arrived to testify using as an exhibit a PowerPoint presentation, labeled Exhibit 109, with comparative models of plant material, giant cells and scar tissue formation. Kaisers objected to three slides in the presentation and to any expert testimony regarding the three slides.

[¶21.]    The circuit court conducted an evidentiary hearing outside the presence of the jury to determine the admissibility of the three exhibits. At the hearing, Kaisers' counsel argued that the exhibits were not timely disclosed and that he was unable to fully test the evidence on cross-examination due to untimely disclosure. Kaisers argued the three exhibits should not be admitted or testified to by Snover as it was both an irregularity in the proceedings that would prevent Kaisers from having a fair trial, and was unfair surprise.

[¶22.]    Defendants stated that the three photographs contained on the PowerPoint slides in question had been taken within the last week prior to trial as pathology specimens came across Snover's desk. The pathology specimen used to create slide eight of the presentation became known to Snover the Friday before he was scheduled to testify. No specific time was identified for when Snover first received the pathology specimens used in slides ten and eleven, other than to say

Snover stacked specimens on his desk for later review and then determined which to use in his testimony the week before he was scheduled to testify. Defendants' counsel stated that she first saw the PowerPoint slides on Sunday evening when Snover arrived in Sioux Falls and she met with him to review his testimony for the following day. Kaiser's attorney did not challenge this representation.

[¶23.]      The circuit court did not make a specific finding that Defendants failed to comply with the ten-day order to supplement, nor was there any indication of willfulness or bad faith on the part of Defendants noted by the circuit court. The circuit court appears to have accepted the statements of Defendants' counsel that the pathology slides became known to Snover the week before trial. The circuit court also made no specific finding as to whether Defendants failed to seasonably supplement the substance of Snover's testimony per the requirements of SDCL 15-6-26(e)(1).

[¶24.]      Instead, after the evidentiary hearing, the circuit court admitted slide eight as substantive evidence, but limited the admission of slides ten and eleven as demonstrative or illustrative evidence[3] citing SDCL 19-9-7 (Rule 104(a)),[4] 19-9-8

---

3.    A demonstrative or illustrative exhibit "is admissible if it clearly depicts the factual situations and will allow the trier of facts to more clearly understand a witness's descriptions." State v. Hartman, 256 NW2d 131, 137 (SD 1977) (citing McCormick on Evidence, § 213 (E. Cleary Ed, 2dEd 1972)).

4.    SDCL 19-9-7 (Rule 104(a)) provides: "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of § 19-9-8. In making its determination it is not bound by the rules of evidence except those with respect to privileges."

(Rule 104(b)),[5] and 19-9-12 (Rule 105).[6] In so doing the circuit court made no mention that Defendants had failed to seasonably supplement Snover's deposition as required by SDCL 15-6-26(e)(1), or that any sanctions were applicable under SDCL 15-6-37. The circuit court instructed the jury as follows at the time the exhibits were offered and entered into evidence:

> 10 and 11, I am only going to receive for a limited purpose and that is for demonstrative purposes. 10 and 11, I guess is tissue from another patient. And the doctor is going to use those, I guess, to explain some things to the jury, but – so you can consider it for that purpose, but 10 and 11 doesn't prove anything else. So, all right, with that, it's received. The circuit court admitted Slide 8 into evidence outright, while Slides 10 and 11 were admitted for illustrative purposes.

[¶25.] Snover testified that slide eight contained an image of scar tissue from a skin biopsy site from an undisclosed patient. Snover testified as follows: "So the question that comes up, and Dr. Smith [Kaisers' expert] testified to this on Wednesday when he was talking about this material, he said that had he seen scar tissue there he would have been more concerned that this plant material was old rather than new." Snover testified that the slide illustrated what scar tissue looks like at two to three weeks after biopsy in order for the jury to compare it to the scar

---

5.    SDCL 19-9-8 (Rule 104(b)) provides: "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

6.    SDCL 19-9-12 (Rule 105) provides: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

tissue along side the vegetable matter on Laura's uterus, rather than take his word concerning the presence of scar tissue alongside the vegetable matter on her uterus.

[¶26.] Snover testified that slide ten contained images of plant material found on an undisclosed patient's perforated intestine approximately one to two days after an injury to the bowel. Snover's testimony focused on the lack of giant cells one to two days after the plant material leaked from the perforation. Snover testified that slide eleven contained images of two pieces of plant material found in an undisclosed female patient three to six weeks after she suffered a rectal-vaginal fistula that caused plant material to leak out of the bowel. Snover focused on the presence of giant cells surrounding the plant material, and how one of the pieces of plant matter appeared to be broken up by giant cells at the three to six week mark and also had scar tissue next to it. Snover pointed out for the jury that the other piece of vegetable matter from the same patient had not been broken apart by the giant cells and no scar tissue had yet to appear at the three to six week mark.

[¶27.] After six full days of trial, the jury deliberated for two days before returning a verdict for the Defendants. The circuit court polled the jury, and indicated on the record that the six man and six woman jury was split ten to two for the Defendants. The circuit court entered judgment on the verdict on March 29, 2005, which was served on Kaisers on March 31, 2005. The circuit court subsequently denied a motion for a new trial. This appeal followed.

[¶28.] Kaisers raise one issue on appeal: Whether Kaisers were denied a fair trial when the circuit court permitted testimony and use of previously undisclosed exhibits by the Defendants' expert pathologist.

## STANDARD OF REVIEW

[¶29.]    The trial court's evidentiary rulings are presumed correct and will not be overturned absent a clear abuse of discretion.  State v. Perovich, 2001 SD 96, ¶11, 632 NW2d 12, 15 (citing State v. Goodroad, 1997 SD 46, ¶9, 563 NW2d 126, 129).  "An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence."  State v. Henry, 1996 SD 108, ¶10, 554 NW2d 472, 473 (quoting In re A.R.P., 519 NW2d 56, 62 (SD 1994) (quoting State v. Moriarty, 501 NW2d 352, 355 (SD 1993); State v. Devall, 489 NW2d 371, 374 (SD 1992))).  As this Court recently noted in State v. Asmussen: "With regard to the rules of evidence, abuse of discretion occurs when a trial court misapplies a rule of evidence, not when it merely allows or refuses questionable evidence."  2006 SD 37, ¶13, 713 NW2d 580, 586 (citing State v. Guthrie, 2001 SD 61, ¶30, 627 NW2d 401, 415 (citing Koon v. United States, 518 US 81, 100, 116 SCt 2035, 2047, 135 LEd2d 392 (1996))).

## ANALYSIS AND DECISION

[¶30.]    Kaisers argue that Defendants' violation of the circuit court's discovery order under SDCL 15-6-26(e)(3), their failure to seasonably supplement discovery under SDCL 15-6-26(e)(1), and the circuit court's subsequent admission of those slides into evidence denied them a fair trial.  Kaisers contend that the use of the exhibits permitted Snover to draw a direct comparison between the appearance of the vegetable matter and surrounding cellular structures on Laura's uterus and those found on Snover's other patients, "directly suggesting to the jury that since the appearance was different and the giant cell formation was not proceeding at the same rate, the vegetable matter could not have emanated form a bowel injury at the

time of Laura's cesarean section." Kaisers argue that Snover's ability to use the previously undisclosed slides precluded them from counteracting his testimony.

[¶31.]     The legislative history, concerning the Federal Rules that govern pretrial discovery, is instructive. In *Hickman v. Taylor*, the United States Supreme Court examined Federal Rules 26(e) to 37 and concluded the rules were "one of the most significant innovations of the Federal Rules of Civil Procedure." 329 US 495, 500, 67 SCt 385, 388, 91 LEd 451 (1947). The Court continued:

> Thus civil trials in the federal courts no longer need be carried on in the dark. The way is now clear, consistent with recognized privileges, for the parties to obtain the fullest possible knowledge of the issues and facts before trial.

*Id.* at 501, 67 SCt at 389, 91 LEd 451.

[¶32.]     At the time of trial in this case, SDCL 15-6-26(e) provided in relevant part:[7]

> A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
>
> (1)     A party is under a duty *seasonably to supplement* his response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters, and (B) the identity of each person expected to be called as an expert witness at trial, *the subject matter on which he is expected to testify, and the substance of this testimony.*
> . . .
> (3)     A duty to supplement responses may be imposed by order of the court, agreement of the parties, or at any time prior to

---

7.     This year, we amended SDCL 15-6-26(e) to reflect the 1993 Amendment to Federal Rule 26(e). *See* 2006 SD Sess Laws ch 290.

> trial through new requests for supplementation of prior
> responses.

(emphasis added).

[¶33.]    Under SDCL 15-6-37(b), a violation of a court order to supplement responses may, at the court's discretion, result in reasonable sanctions against the disobedient party, but not as a punishment for "general misbehavior." *See* Chittenden & Eastman Co. v. Smith, 286 NW2d 314, 316 (SD 1979) (citing Dorsey v. Academy Moving & Storage, Inc., 423 F2d 858 (5thCir 1970)).  Sanctions may include "[a]n order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence." SDCL 15-6-37(b)(2)(B).  Additional sanctions may include the imposition of costs for bringing a motion to compel production under SDCL 15-6-37(a)(4) and 15-6-37(b)(2); an order that the matters or facts involved be taken to be established under SDCL 15-6-37(b)(2)(A); an order striking out pleadings or staying further proceedings until the order is obeyed, dismissing the action or rendering a default judgment against the disobedient party under SDCL 15-6-37(b)(2)(C); an order of contempt of court under SDCL 15-6-37(b)(2)(D).

[¶34.]    The purpose of sanctions under SDCL 15-6-37(b) is "'to compel production of evidence and to promote, rather than stifle, the truth finding process.'"  Haberer v. Radio Shack, a Div. of Tandy Corp., 1996 SD 130, ¶20, 555 NW2d 606, 610 (quoting Schrader v. Tjarks, 522 NW2d 205, 210 (SD 1994) (quoting Magbuhat v. Kovarik, 382 NW2d 43, 45 (SD 1986))).  More drastic sanctions under SDCL 15-6-37(b) are appropriate when failure to comply is the result of willfulness, bad faith or fault.  *Schrader*, 522 NW2d at 210 (reversing exclusion of testimony as

sanction for failure to disclose identity of an expert rebuttal witness); *Magbuhat*, 382 NW2d at 45 (reversing order limiting scope of depositions to discovery by defendants and order denying use of those depositions by plaintiffs at trial for failure by plaintiffs to supplement earlier interrogatories with names of expert witnesses); *Chittenden & Eastman Co.*, 286 NW2d at 316 (reversing order of default judgment entered after sanction striking defendant's answers and affirmative defenses was entered when plaintiff was unable to fully complete interrogatories due to inaccessibility of records through no fault of his own).

[¶35.]     We have not had occasion to precisely define the meaning of the term "seasonably supplement" in the context of SDCL 15-6-26(e)(1).[8]  However, when considering whether a party has failed to seasonably supplement expert witnesses and the substance of their testimony, our holdings have generally focused on three concerns.  First, we have focused less on the time element and more on the existence or lack of bad conduct by the party supplementing close to or at trial.  *See* Isaac v. State Farm Mut. Auto. Ins. Co., 522 NW2d 752, 762 (SD 1994); *Schrader*, 522 NW2d at 210.  Second, we have given consideration to whether the expert witness or evidence concerned a crucial issue in the case.  *See Haberer*, 1996 SD 130, ¶¶21-22, 555 NW2d at 610-11; *Isaac*, 522 NW2d at 762; *Schrader*, 522 NW2d at 210; Fullmer v. State Farm Ins. Co., 498 NW2d 357, 361-62 (SD 1993).  And finally, we have considered whether the expert witness or the substance of his testimony was substantially different from that disclosed during the discovery

---

8.     Black's Law Dictionary defines "seasonable" as "[w]ithin the time agreed on; within a reasonable time."  1379 (8th ed 2004).

process.  *Haberer*, 1996 SD 130, ¶¶21-22, 555 NW2d at 610-11; *Fullmer*, 498 NW2d at 361-62.

[¶36.]     We have upheld a circuit court for refusing to admit previously undisclosed evidence when the offending party knew the name of its expert witnesses and of the existence of the evidence at least twenty-four days prior to trial, yet failed to disclose the information until three days before trial.  *Isaac*, 522 NW2d at 762.  However, we reversed a circuit court for refusing testimony from a plaintiff's rebuttal expert witnesses disclosed ten days before the start of trial, but eighteen days after plaintiffs deposed one expert witness for the defense and eleven days after plaintiffs deposing two additional expert witnesses that challenged the heart of plaintiff's case.  *Schrader*, 522 NW2d at 208-12.

[¶37.]     When the substance of the expert witness's testimony is alleged to have changed or expanded beyond the scope of discovery, our holdings take into consideration the degree of any such change or expansion.  *See Haberer*, 1996 SD 130, ¶¶21-22, 555 NW2d at 610-11; *Fullmer*, 498 NW2d at 361-62.  We have upheld a circuit court's ruling granting a new trial as being within its discretion when a party failed to supplement per the provisions of SDCL 15-6-26(e) that its expert witness had changed his opinion two weeks prior to trial.  *Fullmer,* 498 NW2d at 361-62 (noting that in bifurcated trial, insurer's expert witness's change in testimony "whipsawed" plaintiff with inconsistent positions taken by insurer in two trials as to cause of plaintiff's injury).  However, when an expert witness's testimony did not change and interrogatories included the fact that the expert's testimony would be based on examination of similar undamaged equipment as that

involved in the case, but failed to seasonably supplement where testing of similar equipment would be conducted, we have upheld the circuit court's discretion to admit such evidence. *Haberer*, 1996 SD 130, ¶¶21-22, 555 NW2d at 610-11.

[¶38.] Because SDCL 15-6-26(e) is modeled after Federal Rule 26(e), decisions by federal courts interpreting and applying the federal rule provides assistance in applying our state rule. *See* Miller v. Hernandez, 520 NW2d 266, 269 (SD 1994). Several federal courts have held exclusion of evidence is the proper remedy when a party fails to seasonably supplement pursuant to the 1970 version of Rule 26. *See* Smith v. Ford Motor Co., 626 F2d 784, 794 (10thCir 1980) (citing Coleco Industries, Inc. v. Berman, 567 F2d 569 (3dCir 1997), *cert denied*, 439 US 830, 99 SCt 106, 58 LEd2d 124 (1978); Tabatchnick v. G.D. Searle & Co., 67 FRD 49 (DNJ 1975)). In *Smith*, the Tenth Circuit Court of Appeals found reversible error where a party failed to supplement the nature of its expert's testimony:

> Before an attorney can even hope to deal on cross-examination with unfavorable expert opinion he must have some idea of the basis of that opinion and the data relied upon. If the attorney is required to await examination at trial to get this information, he often will have too little time to recognize and expose vulnerable spots in the testimony.

*Id.* at 799 (quoting Jack H. Friedenthal, *Discovery and Use of an Adverse Party's Expert Information*, 14 STANLREV 455, 486 (1962)). Similarly, many federal courts have found reversible error when testimony is admitted without prior disclosure pursuant to Rule 26. *Id.* at 794 (citing Voegeli v. Lewis, 568 F2d 89, 96 (8thCir 1977); Shelak v. White Motor Co., 581 F2d 1155 (5thCir 1978); Weiss v. Chrysler Motors Corp., 515 F2d 449 (2dCir 1975)).

[¶39.]     Decisions from other state jurisdictions are also helpful. Courts that have found reversible error where a party has failed to seasonably supplement have done so based on the other party's inability to effectively conduct cross-examination. The Hawaii Court of Appeals examined the legislative history concerning the 1970 Amendments[9] to the Federal Rules of Civil Procedure. Swink v. Cooper, 881 P2d 1277, 1282 (HawCtApp 1994). The court noted that the Advisory Committee to the 1970 Amendments contemplated Rule 26(e) violations could be enforced by the exclusion of evidence at trial. *Id*. Ultimately, the court upheld the exclusion of testimony from an expert in a medical malpractice action because opposing counsel was given no advance knowledge of a change in the expert's theory. *Id*.

[¶40.]     An accompanying text to the first draft of the 1970 Amendments to the Federal Rules of Civil Procedure notes:

> In cases of this character (involving expert testimony), a prohibition against discovery of information held by expert witnesses produces in acute form the very evils that discovery has been created to prevent. Effective cross-examination of an expert witness requires advance preparation. The lawyer even with the help of his own experts frequently cannot anticipate the particular approach his adversary's expert will take or the data on which he will base his judgment on the stand.

*Smith*, 626 F2d at 793 (citing McGlothlin, *Some Practical Problems in Proof of Economic, Scientific, and Technical Facts*, 23 FRD 467, 478 (1958)).

---

9.     In addition to amending SDCL 15-6-26(e) to reflect the 1993 Amendment to Federal Rule 26(e), on July 1, 2006 we also adopted SDCL 15-6-37(c), which provides for harsher sanctions if a party fails to seasonably supplement. *See* 2006 SD Laws ch 309. Specifically, under SDCL 15-6-37(c), a party who fails to seasonably supplement is "not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any information not so disclosed." However, courts can impose other sanctions in lieu of exclusion.

[¶41.] The Supreme Court of Kansas upheld a trial court's exclusion of expert testimony where a defendant hospital failed to seasonably supplement the fact that its expert physician relied on tissue slides in forming the basis of his opinion. *Barnes v. St. Francis Hospital & School of Nursing, Inc.*, 507 P2d 288 (Kan 1973). The defendant's expert did not mention the slides during his deposition. *Id.* at 294. The court noted: "we believe [the expert] should seasonably have amended his deposition by disclosing that he had examined the pathological slides in forming his opinion. . . ." *Id.*

[¶42.] Kaiser's counsel asked Dr. Snover in his deposition what materials he relied upon in forming his opinion that the vegetable matter found on Kaiser's uterus predated her c-section. Dr. Snover responded that his experience as a medical professor and pathologist formed the basis of his opinion. He could not provide any literature that supported his theory, nor could he recall any specific patients or other materials he had encountered.

[¶43.] In addition to the deposition, Kaiser's counsel served a request for production of documents requiring Defendants to produce "with regard to expert Dale Snover, M.D.:

> (a) A complete copy of his file related to this matter;
> . . .
> (f) A copy of all photographs or other images made in reviewing this matter;
> (g) Copies of any and all other documents, records, notes, and written material in his possession relating to his investigation, analysis, and opinions in this matter."

Later, Kaiser filed a motion to compel discovery after Defendants refused to provide all the materials its experts were relying on in their opinions. At the hearing, the following exchange took place between the circuit court and defense counsel:

> The Court: And I assume that if the doctor comes up with something new before the trial he will divulge it, and I don't see any problem with that. Counsel for the defense, do you have any problem with that? That's the way we usually handle those things.
>
> Defense Counsel: I would agree. Any time an expert will rely upon something at trial, you supplement your disclosure and say this is new information that he's going to rely upon. And we don't have any problem with that.

[¶44.] At trial, Dr. Snover for the first time relied on two photos of giant cell formation in and around vegetable matter found in the bodies of two undisclosed patients. Dr. Snover also relied on a third photo of scarring in a third undisclosed patient. Despite the requests for production of documents, the motion to compel, the circuit court's order, and the requirements of SDCL 15-6-26(e)(1), these photos were not provided to Kaiser's counsel until the sixth day of trial, only minutes before Dr. Snover was scheduled to testify.[10] The eleventh-hour production of these photos is not consistent with the on-going duty to seasonably supplement as required by SDCL 15-6-26(e)(1).

[¶45.] In this case, Dr. Snover labeled the presence of vegetable material as a "critical issue." He used the slides to demonstrate his theory to the jury that the

---

10. At oral argument Kaisers' attorney conceded he found no fault with the ethical conduct of the Defendant's attorneys concerning this issue. As previously noted, counsel for the Defendant did not become aware of the exhibits until the night before Dr. Snover testified.

vegetable matter predated the c-section. Dr. Snover commented, "[w]hen you see a picture it's not just me telling you, but hopefully you will be able to see it yourself." When comparing the plant material in the slides to Kaiser's, Dr. Snover testified further, "you can see [from the other patient's slides that] while there is plant material here, this is one to two days, there is no foreign body giant cell reaction." Later, Dr. Snover held up the third picture and said, "I have illustrated again from-- just so you will be able to recognize scar tissue when you see it and don't have to trust me."

[¶46.]     Since this evidence was undisclosed prior to trial, Kaiser's counsel was unable to effectively cross-examine Dr. Snover. Dr. Snover testified on cross-examination that "given the histological findings I illustrated" the vegetable matter was present in Kaiser's body for more than one week prior to the c-section. On another occasion, Dr. Snover stated "I believe the histological evidence, stands by itself." Kaiser's counsel had no opportunity to examine, test, or consult with his own expert concerning the photos. Nor was Kaiser's counsel able to ascertain whether the unknown patient's conditions and surgeries were sufficiently similar to Kaiser's. Thus, what had previously been a battle of expert opinions had now become a battle of opinions plus the new physical evidence supporting one expert's view.

[¶47.]     Defendants argue that Kaiser was on notice that the giant cell theory would be at issue, and therefore, there was no surprise. However, its argument fails to consider that Kaiser was not on notice that three other undisclosed patient's cases would be used to physically demonstrate, through pictorial evidence, that only Dr. Snover's opinion was scientifically corroborated.

[¶48.] Defendants also maintain that there was no change in Dr. Snover's position or testimony given at the deposition. However, during his deposition, Dr. Snover testified that he had no physical evidence or medical literature to support his theory. Yet at trial, he was permitted, through the use of the three undisclosed slides, to prove his theory through physical evidence of the formation of giant cells and scarring in other patients. Therefore, to this extent, the basis and support for Dr. Snover's opinion did change at trial. Through the admission of these undisclosed exhibits, Dr. Snover was allowed to change his testimony through foundational enhancement and now provide the supporting physical evidence that he could not provide when Kaiser's counsel took his deposition.

[¶49.] Permitting Dr. Snover to use the undisclosed photos was an abuse of discretion. The fact that Kaiser's counsel was unable to effectively cross-examine Dr. Snover about a central issue in the case harmed Kaiser's substantial rights. The prejudice is obvious and substantial. We reverse and remand for a new trial consistent with this opinion.[11]

---

11. It is argued that a request for a continuance by Kaiser would have sufficed. The Kansas Supreme Court dealt with this very issue in a similar case. Hagedorn by Hagedorn v. Stormont-Vail Reg. Med. Center, 715 P2d 2 (Kan 1986). The court noted:

> How much delay this [a recess] would have occasioned during the trial, and whether it would have rectified the situation, we cannot say. The fact remains that the basis for the doctor's opinion had changed, and there was no supplementation of his deposition.

*Id.* at 7. In this case, the circuit judge may have entertained the possibility of a continuance or a recess so Kaiser's counsel could consult with his own experts or depose Dr. Snover concerning the pictures. Whether and to what

(continued . . .)

#23652

[¶50.]     SABERS, KONENKAMP, and ZINTER, Justices, and,

DOBBERPUHL, Circuit Judge, concur.

[¶51.]     DOBBERPUHL, Circuit Judge, sitting for MEIERHENRY, Justice,

disqualified.

---

(. . . continued)

extent that would have been practical is hard to say.  Nevertheless, the circuit court admitted the evidence.  Kaiser's counsel objected to the pictures, moved for a new trial, and appealed the issue.  He should not be required to raise every possible remedy short of exclusion.  However, the circuit court on remand may consider alternatives in fashioning a remedy for the reversible error in this case.